PIPER, Respondent v.
NEIGHBORHOOD YOUTH CORPS, Appellant

(241 N.W.2d 868)

(File No. 11729. Opinion filed May 13, 1976)

**Costello, Porter, Hill, Nelson, Heisterkamp & Bushnell**, Rapid City, for appellants.

**Lynn, Jackson, Shultz, Ireland & Lebrun**, Rapid City, for respondent.

WINANS, Justice (on reassignment).

This is a Workmen's Compensation case. The deceased, Rick Gordon Randolph, lived with his natural mother, Mildred Piper, the claimant, and Rex Piper, his stepfather. The deceased was hired by the Neighborhood Youth Corps on a summer job in 1972. At lunch time on the first day of his job at Angostora Dam, the decedent went to rest on a raft which lay partly on the shore. The raft floated away from the shore, Rick jumped into the water and drowned.

The Director of Department of Manpower Affairs (Director) found that the accident was within the scope of the decedent's employment and the trial court affirmed this part of the Director's decision. The Director also found that the claimant's assertion of dependency could not be sustained. The trial court, however, reversed this portion of the Director's decision.

We affirm the trial court's decision as to scope of employment but reverse the trial court's decision as to dependency.

The threshold question is the proper scope of review by this court of a review by the circuit court of an administrative finding under the APA.

Although not always made explicit, our cases reveal that in reviewing the circuit court's judgment under the APA this court must make the same review of the administrative tribunal's action as does the circuit court under SDCL 1-26-37. Furthermore, this court must make its decision as to whether the administrative decision can be sustained unaided by a presumption that the circuit court's decision is correct. See Application of Ed Phillips & Sons Co., 1972, 86 S.D. 326, 195 N.W.2d 400; Valley State Bank of Canton v. Farmers State Bank of Canton, 1973, 87 S.D. 614, 213 N.W.2d 459; Lemke v. Rabenberg's Inc., 1975, 89 S.D. 386, 233 N.W.2d 336. See also Application of Jones, 1975, 89 S.D. 191, 231 N.W.2d 844. With this consideration in mind we turn to the substantive issues.

The first substantive question presented is whether the decedent was within the "scope of his employment" when he drowned in Angostora Dam during his lunch hour.

■ The parties agree and we find that an injury may be compensable under the Workmen's Compensation Law even though it occurs during a lunch hour break. This would appear to follow naturally from our decision in Krier v. Dick's Linoleum Shop, 1959, 78 S.D. 116, 98 N.W.2d 486, in which we recognized that an injury which occurred when one was returning from dinner after working hours was compensable when one was required by his employment to be away from his home. See also, 1 Larson's Workmen's Compensation Law, § 21.21(a).

Although acceding to the foregoing principle, the defendant vigorously contends that the decedent had abandoned his employment when he began to rest on the raft. The Krier case offers us guidance as to the point at which one attending to his personal needs so deviates from his employment as to lose the protection of the Workmen's Compensation Act. In Krier we said:

"The controlling factor is whether claimant was engaged in doing something which he might reasonably be expected to do while in the performance of his duties."[1]

We found in Krier that the employee had not deviated from his employment when he traveled two and one-half miles outside of the city in which he was staying overnight so as to eat at a particular restaurant.

The evidence in the case before us as to this point is as follows. The decedent was a sixteen-year-old boy. He was taken to a work site at Angostora Dam about 11 miles from his home. He was, by force of this circumstance, compelled to stay on the employer's grounds. According to the supervisor of the boys, the decedent, along with the rest of the boys, was warned at lunch time that he could not go swimming. However, the supervisor's testimony also indicated that the boys were expected to congregate by the shore during their lunch break and that there was nothing forbidden about this. The supervisor said:

---

1. See also 1 Larson's Workmen's Compensation Law, § 21.84 in which the author proposes "implied prohibition" as the test to determine whether an act in the pursuance of "personal comfort" is to be covered by Workmen's Compensation Laws.

"Well, two of the boys finished eating first and Rick and Montgomery, they ate their lunch, finished before the rest of us did, myself and the two other boys, and they started walking around the shoreline which was all right with me. Wasn't supposed to be working that time of the day and the other two stood by the pickup . . . [later] I was going to get Rick and Montgomery. I figured they were at the shore."

The record shows that the two boys discovered a raft which was lying partially on the shore. The two boys jumped or stepped onto it, lay on their backs and rested for about 20 minutes. At about that time they discovered that the raft had become detached from the shore. The decedent's companion began to swim to shore while still fully dressed. The companion soon became tired and kicked off his new boots. At this point the supervisor appeared on a ridge overlooking the dam and shouted to the decedent that he should remain on the raft. We can infer from other testimony that the decedent could hear the shout but could not understand the words his supervisor was saying. The decedent then jumped, fully dressed, into the water. He soon drowned. His companion was unable to save him because the water was so dirty that his companion could not find him.

The case thus presents us with a question of fact: Was the decedent, by resting on a raft during the noon hour, engaging in an activity in which he might reasonably be expected to engage when he had previously been impliedly authorized to rest and relax on the shore of the dam but further when he had also been instructed not to swim in the dam?

The Director by implication found that the claimant could reasonably have been expected to rest on the raft even though he had been warned not to go swimming. The trial court agreed with the Director.

SDCL 1-26-36 sets out the guidelines for this court in reviewing such a determination. It states that "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." Furthermore, the court may

reverse the determination of the agency when its findings are "(5) Unsupported by substantial evidence on the whole record; (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." (SDCL 1-26-36(1) through (4) are omitted because they are not at issue here.)

Our review of the evidence as recited above does not permit the conclusion that the Director's decision is "unsupported by substantial evidence" or is "arbitrary or capricious." Instead it appears that the Director has carefully weighed the opposing inferences which may be drawn from the evidence and has arrived at an easily supportable judgment. We therefore affirm the Director's decision and that of the trial court that the action here was within the scope of the decedent's employment.

The second substantive issue we consider is whether Mrs. Piper was "dependent" upon her son at the time of his death. SDCL 62-4-14. If dependency is established the claimant will be able to sustain her claim for a percentage of the salary which her son had been earning. If dependency is not established the claimant is limited to recovery of burial expenses not to exceed $1000, SDCL 62-4-16.

The Director found that dependency had not been established. The trial court reversed.

The South Dakota cases are not of great assistance in defining the term "dependency" in any context, including that of a child's support of a parent. The South Dakota Code from 1939 to 1945 did not even employ the term "dependency" with regard to parents but instead allowed compensation to a surviving parent when the decedent was "under a legal obligation to support" the parent at the time of the accident. See SDC 1939, 64.0402(1); SL 1945, Ch. 352, § 1. See Schwan v. Premack, 1945, 70 S.D. 371, 17 N.W.2d 911, 912. The same "legal obligation to support" language survived from 1917 to 1973 with regard to whether a widow or child could receive death benefits. See SL 1917, Ch. 376, § 23; SL 1973, Ch. 312, § 1. (See Demaray v. Mannerud Construction Company, 1964, 80 S.D. 554, 128 N.W.2d 551, for an example of the limited case in which both the "legal obligation to support" and

"dependency" language could come into play.)

Before enactment of the 1939 Code, however, South Dakota's Workmen's Compensation Law allowed compensation to a parent who was "dependent upon him for support". SL 1917, Ch. 376, § 23; RC 1919, § 9458(2). The identical language is employed in SDCL 62-4-14 which we consider today. The best considered of the cases decided under the 1917 terminology is Day v. Sioux Falls Fruit Co., 1920, 43 S.D. 65, 177 N.W. 816. There the court considered a situation in which a mother had received sums of $6.00 to $8.00 per week from her son for five or six years before the son left for service in World War I. This money was used for family expenses. The son did not make any payment in the two years he spent in the service but, in the twenty-five days after returning to his home, he paid a $30.00 grocery bill and a $17.50 house payment. The father was 44 years old, in "good health", and regularly employed at $110 per month. One daughter also contributed $10 to the support of the home. The court held that the foregoing evidence constituted "reasonable or substantial evidence" so as to sustain the finding of dependency made by the Commissioner.

The Day case thus implies that the court in 1920 felt that dependency could be established when the parents received regular contributions which they in fact employed for their support. This interpretation of dependency is in harmony with a more complete definition offered by 2 Larson's Workmen's Compensation § 63.11. The author states that

"A showing of actual dependency does not require proof that, without decedent's contributions, claimant would have lacked the necessities of life, but only that decedent's contributions were relied on by claimant to maintain claimant's accustomed mode of living."

Thus the question for the Director was whether the claimant relied upon the contributions of the decedent to maintain her accustomed mode of living.

This court must therefore in turn examine the evidence to

determine whether the evidence sustains the Director's finding of no dependency. This consists of an inquiry into exactly how much the decedent contributed to his parents and into whether the parents relied on these sums.

The claimant asserts that the decedent's contributions came both in money and in labor. According to the evidence the decedent received income from various part-time jobs and from social security payments.

The record does not reveal how much the decedent earned from part-time jobs over the years. The decedent's mother stated that he "occasionally" used money from these jobs to buy groceries but that in the main he used it for his personal expenses. Thus the decedent was buying his own car, paying for auto insurance and purchasing a "lot of his own clothes."

The social security payments were approximately $80 per month for seven years and about $130 per month for the last two years of decedent's life. The decedent received these because his natural father had predeceased him.

The defendant argues, however, that a parent cannot be "dependent" upon his son under SDCL 62-4-6 when certain of the son's contributions to the parent come from the son's social security payments and not from the son's wages.

We reject this argument. We stated long ago that "The Workmen's Compensation Act is remedial, and should be liberally construed to effectuate its purpose." Meyer v. Roettele, 1935, 64 S.D. 36, 264 N.W. 191. In Meyer we recognized a broad definition of the words "injury by accident" so as to insure greater coverage of the act.

In this case we are concerned with the fundamental issue of who may be a dependent under SDCL 62-4-16. The defendant, in effect, asks us to blind ourselves to the fact that a person may actually be dependent upon another whenever the source of support is other than the wages of the benefactor. Under this definition some of those who are actually dependent would inevitably

be found not to be dependent. Such an interpretation would do violence to the concept of dependency and would undermine the canon of liberal construction of the Workmen's Compensation Act recognized by virtually every court which has considered it.

We hold that dependency may be established without regard to the source of funds granted by the benefactor.[2]

The testimony of the claimant as to the use of the social security fund is therefore critical and is recorded here.

"Q. What was that money used for?

A. We used it for what was necessary if we had to have it for any specific thing, we used it; otherwise, we tried to save it for his further education.

Q. Did you have to dip into this fund often?

A. Well, I don't know what you call often. There were occasions that we did have to borrow from that fund, maybe two or three times a year we had to take larger amounts, but this money was used basically for his clothes and his needs.

Q. Ever used to help pay any type of family bills?

A. Yes, we used it for groceries if we needed it."

---

2.   We do not decide here, however, how or whether contributions from the social security fund fit into the compensation scheme set up by SDCL 62-4-14 that "The amount of compensation . . . shall be such a percentage of the sum provided in § 62-4-12 as the average annual contributions which the deceased made to the support of such parent . . . during two years preceding the injury bear to his earnings during such two years." The obvious dilemma arises because the social security payment could be construed to be included in the term "contributions" but the definition of "earnings" contained in SDCL 62-1-1(3) would seem to exclude these payments. A further difficulty arises when the problem is considered in relation to the desirability of federal-state cooperation in social welfare programs and the concomitant desirability of avoiding overlap. See generally, 3 Larson's Workmen's Compensation Law, § 96.10. The parties have not dealt with these questions and because we find it unnecessary to do so, we decline to further consider them here.

The stepfather's testimony also sheds some light on the use of the social security moneys.

"Q. Usually when that money was borrowed from his account, was it ever paid back?

A. I believe some of it was. We paid some of it back.

Q. But would that be half of it or less than half?

A. Less than half.

Q. There were times you did make an effort to repay him what you borrowed?

A. There were a few times.

\*      \*      \*      \*      \*      \*

Q. There were times when you got along and you didn't have to touch that at all.

A. Yes.

Q. Most of the time you didn't have to touch his money?

A. Most of the time."

The claimant also asserts that the family received "contributions" from the decedent by way of labor on the ranch. The defendant on appeal does not assert that labor may not constitute a "contribution" under the meaning of the Workmen's Compensation Act, and we will therefore assume that it may be included. Contrast Murphy v. Franklin County, 1966, 259 Iowa 703, 145 N.W.2d 465 with Warner v. State, 1973, 190 Neb. 643, 211 N.W.2d 408.

We note to begin with that the record is deficient in that it does not contain reference to exactly how much labor the dece-

dent performed on the ranch although it does disclose that the boy helped with fencing, and repair of the barns. He also would help haul feed from town. Some idea of the monetary value of the work, however, is communicated by the following testimony of the claimant:

"Q. With regard to the work that Rick did on the ranch and you are taking care of his horse and calf on the place, it was a share work type of thing?

A. More or less.

Q. It balanced out evenly between his contribution —

A. Of course not — not the hours that the boy put in but it gave him an interest in the ranch because he had his horse and animals there to help.

Q. What you were principally doing was training him as a young man in the ranch work?

A. Yes.

Q. Giving him a sense of responsibility?

A. Trying to, right."

The record also discloses that the ranchers in the area often traded work and that after the death of the decedent the stepfather was forced to do "traded" work which his stepson had previously done. Further, there is an assertion that the family was forced to hire labor to do that which the son had formerly done on the family ranch. However, there is neither any indication of how much extra "traded" work the father was forced to do nor is there an estimate of the aggregate cost of additional hired labor on the ranch.

We pointed out above that our only function on this appeal is to determine whether the Director's holding can be sustained by the evidence pursuant to SDCL 1-26-37.

Distilled to its essence, that evidence is merely that the claimant occasionally took unspecified sums from the joint account of the decedent to buy groceries and other items for the family and that the decedent sometimes purchased groceries from his part-time job pay. The evidence does not reveal how much was expended or how often it was expended, although it does demonstrate that the family repaid some of these funds. There is no claim that the family would have received any regular contribution from the pay the decedent would have earned on his new summer job. The record does, however, demonstrate that the primary purpose of the social security fund was to pay for the decedent's education and personal needs and that the primary use of the part-time job money was to take care of the needs of the decedent. Finally the evidence shows that the decedent spent an unspecified amount of time helping his stepfather in the ranch work.

■As we found in examining the issue as to scope of employment, it appears that the Director has weighed the evidence and the opposing inferences and arrived at a supportable judgment. We cannot say that the vague and ambiguous testimony submitted to the Director and to the courts demands a reversal of the Director's decision. Therefore, we hold that the Commissioner's finding as to dependency is supported by substantial evidence.[3] The trial court's opinion to the contrary is therefore reversed.

We note in conclusion that the cases relied on by the claimant are distinguishable from the facts of our own case. In Blue Ribbon Pie Kitchens v. Long, 1952, 230 Ind. 257, 103 N.E.2d 205, the deceased son made a regular $10 a week contribution to the household budget. No evidence of a regular contribution to the family budget is present here.

---

3. The defendant invites us to find that no dependency exists under the rule espoused in 2 Larson's Workmen's Compensation Law, §§ 63.12 and 63.22 that one whose contribution is offset by the value of the board and room he receives is merely supporting himself and the parents therefore cannot logically be dependent upon him. We note, however, that it is impossible for us to weigh the value of the board against the value of the decedent's contributions because neither side of the equation was presented clearly to the Director, the trial court, or to this court. Thus we will leave for another day the decision as to whether this rule should be the law in South Dakota.

In Jewell v. Olson Construction Co., 1961, 122 Vt. 434, 175 A.2d 509, it was definitely established that the decedent performed 20 to 25 hours of labor per week on the farm. In the case before us we have nothing but a general showing that he did some work on the farm. We are not informed of whether it was five or fifty hours per week. Furthermore, in Jewell the income from two cows owned by the decedent went to the parents. Finally, the decedent paid his mother $2.50 per week for putting up lunches.

■ We add that in neither the Blue Ribbon case nor in the Jewell case did the court find dependency as a matter of law. The courts merely found that they could not, as a matter of law, say that dependency did *not* exist. These courts, like our own, are compelled by statute to give considerable deference to a finding of the Workmen's Compensation Board and this consideration clearly and properly influenced the decisions of the Indiana and Vermont courts. See generally SDCL 1-26-37.

The decision of the circuit court upholding the finding that the injury was within the scope of employment is affirmed and the decision of the circuit court reversing the Director's finding of no dependency is reversed and remanded for proceedings in that court not inconsistent with this opinion.

DUNN, C. J., and WOLLMAN and COLER, JJ., concur.