The CITY OF BROOKINGS, South Dakota, a Municipal Corporation, Appellant,

v.

The DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.

No. 12239.

Supreme Court of South Dakota.

Feb. 1, 1979.

Alan F. Glover of Denholm & Glover Law Firm, Brookings, for appellant.

Warren R. Neufeld, Asst. Atty. Gen., Pierre, for respondent; William J. Janklow, Atty. Gen., Pierre, on the brief.

PER CURIAM.

The City of Brookings (City) seeks a permit from the Department of Environmental Protection (Department) to operate a landfill. Although a permit was granted in 1974, the Department refused to grant a permit for the same site in 1975. The Board of Environmental Protection (Board) heard evidence at a contested case hearing and also refused to grant the permit. The circuit court upheld the Board's decision on review under SDCL 1–26–36. We hold that there is not substantial evidence on the whole record to support the Board's determination. We therefore reverse the circuit court's order and remand the case with instructions that the circuit court remand the case to the Board for issuance of the permit.

The City has operated a landfill on a 160 acre tract two miles south of the City since 1960. Since there were objections by persons living in the vicinity prior to establishment of the landfill, studies were undertaken to determine the effect that the landfill would have on the environment. Study has continued since that time. Most of this research is included in the record of this case, and includes eight Masters' theses written by degree candidates in the Department of Civil Engineering at South Dakota State University.

The landfill site is located over the Big Sioux aquifer, which flows from northeast to southwest across the site. There are no communities between the landfill and the point at which the aquifer flows into the Big Sioux River. There are, however, wells from which water for domestic use is taken. In addition, there are several communities that obtain drinking water from the River. Witnesses before the Board estimated that water in the aquifer flows under the landfill at the rate of one to three feet per day. Because of concern that the landfill might cause degradation of the water in this aquifer, the City drilled a number of test wells and monitored them to determine the effect of the landfill on groundwater quality.

Through this monitoring, researchers discovered that the water directly under the landfill could become polluted. A trench was constructed in 1966 to intercept and treat the groundwater flowing under the landfill. Two of the eight Masters' theses deal with the beneficial effect of this trench on the water. These theses concluded that the trench improved the quality of the water flowing under the landfill by dilution and by the action of algae on the contaminants in the water.

The City has used various refuse disposal techniques in the landfill. In the early years, garbage was dumped into pits *below* the natural ground level. None of these pits, however, contained standing water. The City burned all combustible garbage until about 1973. At that time, the fill was at about the natural level of the land. The City has since disposed of garbage above the natural ground level. At the time of the contested case hearing before the Board (September 1975), the fill was eight to ten feet above ground level. Garbage is no longer burned, but is compacted and covered daily with a layer of porous gravel. These practices are generally in line with current landfill practices, although the better practice is to use nonporous clay, rather than gravel, as cover.

The maximum high water table observed under the landfill occurred in 1969 and 1970, when the water was within three to four feet of the natural ground elevation. At the time of the hearing, the water had been eight to ten feet below the ground for the previous four years. The dumping sur-

face current at the time of the hearing was thus at least eleven feet above the area's maximum high water table, but the earlier dumping surface was within six feet of this water table.

The Department's witnesses testified on the suitability of the site for a landfill and the probable effects of disposal in the site. Although some of these witnesses had done geological surveys in the Brookings area, none of them had tested any water from under the site or downstream from it. They thus had no first-hand knowledge of any water pollution at the site.

Permits were first required for landfills of this type in 1974. The City submitted its application, along with essentially the same evidence contained in the record of this case. The Department issued the permit, on the basis of a staff recommendation, without a hearing. The City sought renewal of the permit in 1975. The Department recommended against such renewal, but cited no change of the facts and no new rules or statutes. It contends only that a mistake was made, and that its 1974 evaluation of the evidence was insufficient. The Board and the circuit court upheld the Department's denial of the permit, and the City has appealed.

The only issue presented by this appeal is: Is the Board's determination supported by substantial evidence on the whole record? We conclude that the Board's determination is not so supported.

■ In reviewing an administrative decision, we must examine the record to determine whether the decision is supported by substantial evidence on the whole record. SDCL 1–26–36.[1] In addition, we review in

the same manner as the circuit court, unaided by any presumption of the correctness of the circuit court's determination. *Piper v. Neighborhood Youth Corps*, S.D., 241 N.W.2d 868 (1976).

■ We may seek guidance in decisions of federal courts that have reviewed agency determinations on a "substantial evidence" standard with wording similar to our own. *See In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). As the Supreme Court of the United States pointed out in *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the requirement that the court view the record *as a whole* is of particular interest. The requirement was added to the Federal Administrative Procedure Act by Congress in order to insure that the federal reviewing courts would consider *all* the evidence in the record, not just that supporting the agency determination. *Universal Camera*, supra. We ascribe a similar intent to our legislature in passing SDCL 1–26–36(5).

■ The requirement that we look at the whole record does not, however, allow us to substitute our own judgment for the Board's judgment as to the *weight* of evidence on questions of fact. SDCL 1–26–36. As the Court said in *Universal Camera*, supra, 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. at 467–68:

> To be sure, the requirement for canvassing "the whole record" in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the

---

1. At the time the trial court reviewed this decision, SDCL 1–26–36 read:

   The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
   (1) In violation of constitutional or statutory provisions;

   (2) In excess of the statutory authority of the agency;
   (3) Made upon unlawful procedure;
   (4) Affected by other error of law;
   (5) Unsupported by substantial evidence on the whole record; or
   (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

   A court need not enter its own findings of fact and conclusions of law but may affirm, modify or reverse the findings and conclusions entered by the agency as part of its judgment.

Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.* Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

Thus we may not displace the Board's choice between conflicting inferences or conclusions, both of which have support in the evidence. We may, however, reverse findings that are not fairly supported by evidence in the record, when the record is considered as a whole.

**2.** This chapter has recently been transferred to SDCL title 34A and is now SDCL ch. 34A–6.

**3.** ARSD 34:17:03:10, as applicable to this case, reads as follows:

*Disposal Site Locations Restricted.* Solid waste disposal operations are prohibited:

(1) Within one thousand feet of any river or stream unless the operator of the disposal site submits satisfactory evidence showing that pollution of such waters is not likely;

(2) Within the flood plain of a water course unless the operator shows pollution of such water course is not likely and flooding of the disposal site is remote;

(3) Within an area from which solid waste or leaching therefrom may be carried into any surface water;

(4) Within an area from which leaching from solid waste is likely to have a detrimental effect on the ground water domestic uses;

(5) Within one thousand feet of an existing public park unless there is no feasible alternative to the operator or the disposal site is included in a plan for expansion of the park;

With these standards in mind, we review the evidence in this case. The Board found that the City's disposal site and methods specifically violated certain rules adopted pursuant to SDCL ch. 34–16B, Solid Waste Disposal.[2] These rules, ARSD 34:17:03:10, prohibit solid waste disposal in specific areas.[3] The Board concluded that the City was violating subsections (4) and (8) of this rule.

The conclusion that the City was, at the time of the hearing, dumping within six feet of the area's normal high water table is unsupported by the evidence. Charles Darnell, the City's engineer, testified that the working face of the landfill current at the time of the hearing was eight to ten feet above the ground, although it was approximately at ground level two years before the hearing. Since that time, the City has stopped burning garbage, and the fill has risen to its level in 1975 as a result. Darnell testified, however, that the 1975 fill level was eight to ten feet *above* natural ground level. The maximum high water table observed occurred in 1969 and 1970, when the water was about two feet below the ground level.

(6) Within one thousand feet of a state trunk highway unless it is shown that the site would not constitute a safety hazard on the highway;

(7) Within an area which is not screened by natural objects, plantings, fences or other appropriate means so that the disposal site and operations of the site are not visible from a state trunk highway or public park;

(8) Within an area where the lowest portion of the fill would be less than six feet above the area's normal high water table, unless the applicant can show that adequate measures have been taken to assure, with reasonable certainty, the prevention of leaching into the ground water which would render it unsuitable for domestic purposes.

The Board's revision of its solid waste disposal rules (formerly ARSD art. 34:13, now ARSD art. 34:17) has not been published in the bound volumes of the 1974 Administrative Rules of South Dakota, nor in the 1975, 1976 or 1977 Supplements to that publication.

This leaves the question of whether ARSD 34:17:03:10(8) proscribes dumping garbage on top of the fill when the bottom of the fill is within six feet of the normal high water table. The Department argues that old fill provides a conduit through which contaminants from new garbage can leach and contaminate groundwater. There was no evidence, however, that such fill is any more porous than naturally occurring soils. Although Merlin Tipton testified and introduced a study on leaching in an Illinois landfill, he admitted that he was not qualified to evaluate leaching, and that the difference in rainfall between South Dakota and Illinois could affect the validity of the study. Moreover, as we interpret this rule, the question for the Board in 1975 was whether garbage deposited in 1975 and thereafter would be within six feet of the normal high water table, not whether garbage is more or less porous than soil. If garbage to be deposited in 1975 and thereafter would not be within that area, its dumping is not proscribed by ARSD 34:17:03:10(8), no matter what materials are under the dumped garbage.

The finding that waste disposal from the landfill was likely to cause leaching that would have a detrimental effect on groundwater domestic uses, ARSD 34:17:03:10(4), is likewise without support in the evidence. Although the water directly below the landfill may become unfit for domestic uses, it is unlikely that it will ever be so used. The City owns all the land above the landfill and it will not permit anyone to use the water for domestic purposes. The rule in question prohibits disposal only where the leaching is likely to have a detrimental effect on actual groundwater domestic uses. The Department was thus required to present evidence of adverse effects of the landfill on the use of water in the aquifer "downstream" from the landfill in order to show a violation of ARSD 34:17:03:10(4).

■ Certain studies have found that the water directly below the landfill does violate some United States Public Health Service (USPHS) standards. There is not, however, any evidence that this is the result of leaching from the landfill. In addition, the violation of USPHS standards does not, in itself, prove the unfitness of the water for domestic uses. The Department presented no evidence beyond that found in the theses that the water was contaminated. None of its witnesses had tested the water, and none of them testified to its contamination or purity. They sought to establish probability of adverse effects on domestic uses by studies of supposedly similar landfills. We must give such evidence the maximum possible weight, since it supports the Board's conclusion. On examining the whole record, however, we conclude that evidence of what should or could happen cannot overcome evidence of what actually has happened. After fourteen years of dumping in the same location, and after the extensive testing and research conducted, the Department has not presented evidence that the water downstream from the site is contaminated as a result of the location of the landfill. It appears from this record that any leaching from the landfill in the last fourteen years has not had an adverse effect on groundwater domestic uses. There is no evidence on the record that this situation will change.

■ The initial determination of whether a permit should issue is for the Board, but this determination is reviewable under SDCL 1–26–36. Under review for substantial evidence, we will look to the criteria set forth by the legislature and by the agency in its rules to determine what factors should have been considered. We have already determined that the evidence is insufficient to support the conclusion that the City violated any specific rules. The remaining inquiry is whether the City has established that the location is suitable in spite of the fact that it violates no specific rules. Under ARSD ch. 34:17:04, no person is permitted to operate a solid waste disposal system without a permit, and permits are valid for only one year from the date of issuance. The Board interpreted this requirement as placing the burden on the City to prove the propriety of its site. We assume, without deciding, that this burden

was correctly placed. We conclude, however, that even when the burden[c] is so placed, there is not substantial evidence on the record to support the Board's determination.

A review of all the evidence in the record is necessary to determine this question. The City offered eight Masters' theses and a number of studies, all of which were done specifically on the Brookings landfill. The degree candidates analyzed water from beneath and beyond the landfill and drew various conclusions. Generally, they agreed that the landfill had no significant adverse effect on the domestic uses of water downstream from the landfill, although several recommended further study. Several of the theses study the beneficial effect of a trench that was built to intercept the groundwater leaving the landfill and conclude that the trench is beneficial. The City also offered the testimony of Professor James Dornbush of the South Dakota State University Department of Civil Engineering, a recognized expert in solid waste disposal who did studies and supervised some of the theses in question. He testified that his studies found little or no adverse effect on groundwater quality either beneath or downstream from the landfill, although he would not personally drink the water from under the landfill. The City Engineer, Lloyd Dornell, testified to disposal practices at the landfill.

The Department presented several witnesses. Steven Mousel testified that he inspected the landfill in June 1975, and sent a letter stating that it complied with minimal Department standards. Assad Barari testified that the location was not suitable because it is over an aquifer, but admitted that he had not tested any of the water under the landfill. He said that there are better sites, from a geological standpoint, in Brookings County and also said that Dornbush's testing of the water was incomplete. Neither he nor the Department offered any test results to back these assertions. Merlin Tipton testified that he had done geological surveys in Brookings County and that the landfill site was not appropriate for use as such. He did not, however, offer any water

test results. Don Mitchell, a state chemist, testified that he would like to have seen test results for chemicals in the water other than those offered by the City. He did not, however, offer any such tests, and testified that he had never personally tested any water from the landfill site. In addition to the testimony of these witnesses, the Department cites scattered data in the Masters' theses in support of the Board's determination. None of the Department's witnesses testified to the meaning of these raw data.

■ On this record, we conclude that the Board's action cannot be justified. The City presented witnesses and research specifically dealing with this location. The Department's witnesses, on the other hand, spoke in generalities. None of them ever tested any water from below the landfill or downstream from it. Their expertise does not permit them to draw conclusions unsupported by specific facts and research. The Department's use of raw data from the Masters' theses is also insufficient to uphold the Board's determination. The Department's witnesses and studies do not relate these raw data to domestic uses of water.

■ The Department argues, finally, that there are better sites, from a geological standpoint, in Brookings County. There was no evidence, however, that these sites are suitable from a political or economic standpoint. Even where a site is geologically suitable, neighbors might object or the cost might be prohibitive. These factors must also be considered in such cases. In any event the question is whether this site is minimally suited to a landfill, not whether it is the best site in Brookings County. Since the Department failed to present sufficient evidence to rebut the City's showing that the site was so suited, the permit should have been granted.

For the reasons stated, we reverse the circuit court's order and remand the case with instructions that the circuit court remand the case to the Board for issuance of the permit.

HENDERSON and FOSHEIM, JJ., not having been members of the court at the time this case was orally argued, did not participate.