Arthur C. OLSON and Sophie A. Olson, Petitioners and Appellants,

v.

The CITY OF DEADWOOD, South Dakota, Appellee.

No. 17602.

Supreme Court of South Dakota.

Considered on Briefs Dec. 4, 1991.

Decided Feb. 5, 1992.

Rehearing Denied March 2, 1992.

---

Brad P. Gordon, Fuller & Tellinghuisen, Lead, for petitioners and appellants.

Steven M. Christensen, Mattson, Rachetto & Christensen, Deadwood, for appellee.

WUEST, Justice.

Appellants, Arthur and Sophie Olson (the Olsons) d/b/a Four Aces, appeal two orders entered by the circuit court dismissing their Petition for Writ of Certiorari brought pursuant to SDCL 11–4–25 through SDCL 11–4–29. The Olsons' initially appealed to the circuit court from a decision of the Deadwood City Planning and Zoning Commission (the Commission), sitting in its capacity as the Deadwood Board of Adjustment (the Board or Board of Adjustment) which, in separate actions, voted unanimously to deny the Olsons' proposed commercial use of the property in question. We affirm the circuit court.

The Olsons purchased land within the city of Deadwood and proposed to build a seventy-six-unit, twenty-four-hour motel with an accompanying restaurant, giftshop and lounge. This property is located in an area which lies east of Whitewood Creek which, in turn, lies east of Deadwood's Main Street. While there are many commercial enterprises in the immediate area on the west side of Main Street, including motels, there are none on the east side.[1] On the east side of Main Street there is a narrow strip of land lying between it and the creek. The north end of this strip is bordered by McKinley Street which bridges Whitewood Creek. This area is owned by the city of Deadwood which presently uses the south end as a parking lot. Initially, the City planned to use the north end as the site for a new fire hall. That plan was later abandoned and the fire hall was located elsewhere.

The Olsons recognized the present access routes to their property would be totally unsatisfactory given the proposed use. The only access available was through existing residential streets. In lieu of using residential streets, they proposed to construct an 18.5 foot wide street platted as

---

1. The trial court found Whitewood Creek in the area in question is a substantial natural monument and, thus, in a physical way, significantly separates the Olsons' property from the rest of the Main Street properties. The court stated the east side of the creek was entirely residential in character. *See* discussion in footnote 4, *infra*. The nearest commercial development on that side of the creek is some distance from the site (estimated by one participant at the hearing to be one-half mile in distance).

Fargo Street. This street would have run east from Main Street, between the City's then proposed fire hall and its present parking lot, and would cross Whitewood Creek on a bridge to be constructed (the Olsons were willing to build and maintain the requisite bridge).

The area in which the subject property lies is presently zoned under the City of Deadwood Zoning Ordinance as an historic district. It was previously zoned residential. Although commercial uses are permitted in this district, all proposed uses are subject to review. According to Section 6.5 B. of the ordinance:

All proposed uses of land and structures, including their cosmetic or structural alteration within the boundaries of the Historic District shall be subject to the following review procedure:
1. Review by the City Historic Preservation Commission as provided by City Ordinance 777.
2. Review by the State Historic Preservation Office as provided in SDCL 1–19–11.1.
3. Review by the Planning and Zoning Commission.

Section XV of the ordinance provides, in part, that:
A. Use on Review Permits may be issued by the Board of Adjustment, for any and only the uses required or permitted by the provisions of this ordinance, under the following procedures:
B. Standards for Use on Review. In granting a Use on Review, the Board of Adjustment shall ascertain that the following criteria are met:
1. That the use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purpose already permitted, nor diminish and impair property values of the vicinity;
2. That the use will not impede the normal and orderly development of surrounding property for uses predominant in the area;
3. That adequate utilities, access, drainage and other necessary facilities can be provided;
4. Any use permitted on review shall be established and conducted in conformity with the terms and conditions accompanying the approval of the permit.

The first decision with which we are concerned was made by the Board on May 1, 1990, at which time it heard, in joint session with the Commission, public comments on the Olsons' application for a "permitted use upon review" of the property owned by them. The Olsons' application and the joint hearings were all brought and held pursuant to the city of Deadwood's zoning ordinances. Both the Planning and Zoning Commission and the Board of Adjustment denied the Petitioners' request. The reasons stated were: (1) The use would be injurious to the residential character of the area, and (2) problems associated with access to the proposed site.

The Olsons petitioned the circuit court to review the Board's decision. The circuit court upheld the Board's decision in its November 1990 memorandum opinion. The Olsons moved for a new trial pursuant to SDCL 15–6–59(a)(4) and (6) (1984);[2] and for a hearing via SDCL 19–10–5 (1987) on the propriety of the court's having taken what they considered to be judicial notice of the residential nature of the property in question.[3] The new trial motion was based

---

**2.** SDCL 15–6–59(a)(4) and (6) provide:
A new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes:
   *    *    *    *    *    *
(4) Newly discovered evidence, material to the party making the application, which he could not with reasonable diligence have discovered and produced at the trial;
   *    *    *    *    *    *
(6) Insufficiency of the evidence to justify the verdict or other decision or that it is against law[.]

**3.** SDCL 19–10–2 (1987) (Rule 201(b)) states judicial notice may only be taken of facts not reasonably in dispute.

on the fact the City had decided to build the new fire hall in a different location; and because the Olsons alleged insufficient evidence existed to support the Board of Adjustment's finding that the proposed use would be injurious to the uses already present in the immediate vicinity (residential). The circuit court denied the motion for a new trial ruling the planned fire hall was not a material consideration in its earlier decision. The circuit court also held its findings did not constitute judicial notice of the facts in question citing various places in the record where it had gleaned the pertinent facts.

After the trial court denied the Olsons' request for a new trial, the Planning and Zoning Commission granted the Olsons a rehearing based upon changed circumstances. The evidence adduced at the previous hearing was incorporated by reference in the April 1991 hearing. The Olsons were allowed to present new evidence. The Commission again recommended denial of the proposed use. It did not state reasons for its denial. The Board then convened and denied the proposed use. Again, no reasons were specified.

The Olsons moved for a new trial again because of new evidence and because the Board failed to state reasons for its denial. After a hearing, the circuit court again determined the Board's decision was based on substantial evidence. But, because the Board failed to state reasons for its denial, the circuit court remanded to allow the Board to enter reasons for its denial.

Yet another hearing was held before the Board. It did not hear evidence, but entered reasons for denying the Olsons' "use on review" permit. One of the three voting board members was not present at the earlier rehearing and thus, had not heard the evidence. After the reasons were adopted, the trial court dismissed the Olsons' petition.

The Olsons contend the action of the City in denying their application "was and is illegal inasmuch as said denial was not warranted by the facts, was unjust, arbitrary, capricious, and not based upon substantial evidence." Although the Olsons raise five issues in their brief, the real issue presented is whether the Board's actions constituted an abuse of discretion or were arbitrary or illegal. The Olsons' primary complaints are:

(1) that the Board based its decision only on public outcry which was uninformed, and therefore, there was no substantial evidence to support the Board's decision and,

(2) the reasons given by the Board were conclusory, merely restatements of the language of the ordinance, and therefore were arbitrary.

■ We initially determine our scope of review. In *Graves v. Johnson,* 75 S.D. 261, 266, 63 N.W.2d 341, 344 (1954), we stated: "As to a decision by a board of adjustment made pursuant to [SDCL 11–4–25 through 29], the question on ... review is whether an order of the board is supported by substantial evidence and is reasonable and not arbitrary." That statement was obiter dictum. Nonetheless, we feel it states the correct standard of review. 4 R. Anderson, *American Law of Zoning 3d* § 27.30 (1986). *See also Honn v. City of Coon Rapids,* 313 N.W.2d 409, 416–17 (Minn. 1981). Reasonableness is measured by examining whether standards set out in the local ordinance have been satisfied. *Id. City of Barnum v. County of Carlton,* 386 N.W.2d 770, 775 (Minn.App.1986); *White Bear Docking v. City of White Bear Lake,* 324 N.W.2d 174, 176 (Minn.1982). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,]" *Pierce v. Underwood,* 487 U.S. 552, 564–65, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490, 504 (1988); *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938), or "evidence which ... [affords] a substantial basis of fact from which the fact in issue can be reasonably inferred.... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 299–300, 59 S.Ct. 501, 505, 83

L.Ed. 660, 665 (1939). "[The] phrase does not mean a large or considerable amount of evidence ...," *Pierce*, 487 U.S. at 564–65, 108 S.Ct. at 2549, 101 L.Ed.2d at 504, but means "more than a mere scintilla" of evidence, *Consolidated Edison*, 305 U.S. at 229, 59 S.Ct. at 217, 83 L.Ed. at 140.

■ We may not substitute our judgment for that of the Board. However, we must examine the entire record to determine whether its findings are supported by substantial evidence. R. Anderson, *supra*, § 27.30. *See also Vetter v. Town of Bison*, 278 N.W.2d 202, 203 (S.D.1979) (citing *City of Brookings v. Department of Environmental Protection*, 274 N.W.2d 887, 889 (S.D.1979)). "In addition, we review in the same manner as the circuit court, unaided by any presumption of the correctness of the circuit court's determination." *Vetter*, 278 N.W.2d at 203 (quoting *City of Brookings*, 274 N.W.2d at 889). *See also Honn*, 313 N.W.2d at 415; *City of Barnum*, 386 N.W.2d at 774.

■ Initially, we agree with the Olsons that vague reservations expressed by Commission members and nearby landowners are not sufficient to provide factual support for a Board decision. However, more was presented here than "vague reservations." *Cf. C.R. Investments, Inc., v. Village of Shoreview*, 304 N.W.2d 320, 325 (Minn.1981).

### *May 1, 1990 DECISION:*

■ We begin with the May 1, 1990 decision by the Planning Commission later adopted by the Board. The circuit court found there was sufficient information in the record to support the Board's conclusions. We agree.

The Commission/Board first concluded the area involved was primarily residential and would be adversely impacted by the additional traffic, noise and other problems associated with commercial usage, and thus, the proposed use would be injurious to the use and enjoyment of other residential properties in the neighborhood. The Olsons' plan for the motel complex consisted of a twenty-four-hour-a-day operation, including a restaurant, gift shop and lounge. The City Planner and several area residents testified this activity would be injurious to the residential character of the neighborhood because of increased traffic and activity in what was essentially a residential neighborhood.

Throughout these proceedings, various opponents and proponents of the project expressed their views. An appraiser testified that property values in the vicinity would not be adversely affected by the proposed project. Nonetheless, many area residents testified that they were concerned with increased traffic likely to be caused by the project and lack of access other than through residential streets. Apparently, traffic problems were already being created with regard to earthwork being done on the Olson property. Area residents were concerned increased traffic would cause danger to children playing in the neighborhood. In addition, although the motel would have had ample parking for its guests, no parking was available for employees which meant they would have to park either in the city lot, exacerbating an already existing parking shortage, or along residential streets causing increased congestion there.

The second reason expressed by the Board for denying the permit was the inadequacy of access. After the Planning and Zoning Commission went into session, it became apparent another but related concern about the project was traffic problems caused by lack of access to the site by means other than residential streets. It was known to all concerned that access to the project required opening Fargo Street, which was platted at 18.5 feet. The Olsons presented information at the hearing that the proposed street would be able to handle two-way traffic, although it would not allow for any parking. However, the City Planner stated, in his opinion, Fargo Street, even if opened, would not provide sufficient access. Although other streets in Deadwood are as narrow as Fargo Street would have been, newer streets are required to be platted at fifty feet (because Fargo Street was platted in the 1800's, this requirement does not apply). The City did not desire to

open Fargo Street, as it did not want to be liable for maintenance and safety in the event the Olsons went out of business. We specifically note the City's unwillingness to open Fargo Street or accept liability for it once the street was opened. *See* SDCL 11–3–12 (1982) ("No governing body shall be required to open, improve, or maintain any ... dedicated street ... solely by virtue of having approved a plat or having partially accepted any ... dedication, donation or grant."); SDCL 11–3–12.1 (1982) (approval of proposed access required prior to filing plat of proposed development). In addition, at the time the May 1990 hearing was commenced, the City was planning to build a fire hall at the location of Fargo Street. The City Planner stated the use of Fargo Street for access would impede normal and orderly development of the City's surrounding property and in the City's construction of the proposed fire hall. He also stated the site was not suitable for the project absent extensive engineering. Finally, the Board reasoned access on Fargo Street was infeasible because of the confusion and congestion it felt would be created by the location of the narrow street adjacent to a municipal parking lot.

In small towns, city officials have the experience and competence to assess impact on property values and to weigh and assess similar values without relying on experts to determine whether or not a use is in harmony with the zoning ordinance and master plan. *White Bear Docking,* 324 N.W.2d at 177. Here, city officials utilized their experience and, in conjunction with testimony from area residents, concluded the proposed motel would have an adverse impact on the surrounding residential neighborhood. In addition, the Board concluded the proposed access was inadequate. Based on the above, we conclude there was sufficient factual support for the conclusions reached by the Board in its May 1990 hearing.[4]

The Olsons argue the City failed to acknowledge the portion of the City's "comprehensive plan" which discusses the "area east of Spring Creek" within the city limits. According to the trial court's November 1990 memorandum opinion and the Olsons' brief, the Comprehensive Zoning and Subdivision Plan of the City of Deadwood (Report No. 3) of 1971, places the Olsons' property in planning area number four. The report states:

> This area lies east of Spring Creek within the City limits. It is proposed that cluster like development with a commercial motel-hotel district be encouraged. The new parks should be created to form a scenic break between the rodeo grounds and the campground. Another park is also proposed south of rodeo grounds and near the creek.

Thus, the Plan encourages development in a "cluster-like" manner with a commercial motel/hotel district.

A comprehensive plan must be complied with when zoning regulations are promulgated. SDCL 11–4–3 (1982). The statute does not refer to "use-on-review" applications. Here the city ordinance, by allowing commercial development on a "use-on-review" basis, is consistent with the comprehensive plan. However, before a developer is entitled to a permit, the city ordinance requires the Board to find the proposed use will not offend the ordinance's prerequisites; that is, the proposed use may not "be injurious to the use and enjoyment of other property in the immediate vicinity ... for the purpose already permitted," and must have "adequate utilities, access, ... and other necessary facilities." *Cf. Save Centennial Valley Ass'n., Inc. v. Schultz,* 284 N.W.2d 452, 457 (S.D.1979).

The Olsons also argue, because the Board merely restated the sections of the ordinance which were offended and did not set forth findings of fact, the decision was arbitrary and capricious. We disagree.

---

**4.** The Olsons maintain their argument before this court that the trial court improperly took judicial notice of the residential character of the neighborhood in its November 1990 memorandum opinion and its findings of fact. Since we review the trial court de novo, we find the Olsons' argument on this point irrelevant to the question of whether the Board's actions were supported by substantial evidence.

■ Unlike the situations presented in many of the cases cited by the Olsons, the city ordinance in question here does not require the Board to make findings of fact. We note a board of adjustment is not a state agency and, therefore, is not subject to the state administrative procedure and rules statutes. SDCL 1–26–1(1) (1991 Supp.). "In the absence of [an ordinance requiring such], a board of adjustment is not required to include findings of fact or a statement of reasons for its decision." *South Maple Street Association v. Bd. of Adjustment*, 194 Neb. 118, 230 N.W.2d 471, 472 (1975). *Accord Crane v. Bd. of Cty. Com'rs. of Sarpy Cty.*, 175 Neb. 568, 122 N.W.2d 520, 524 (1963); *City of Detroit v. S. Loewenstein & Son*, 330 Mich. 359, 47 N.W.2d 646, 649 (1951). *But see Honn*, 313 N.W.2d at 416 (municipal body must have reasons for its decision recorded in more than just a conclusory fashion); *Citizens, Etc. v. Pottawattamie Cty. Bd. of Adjust.*, 277 N.W.2d 921, 925 (Iowa 1979) (imposing requirement, in dicta, that board make findings "sufficient to enable a reviewing court to determine with reasonable certainty the factual basis and legal principles on which the board acted," despite absence of requirement in ordinance).

We conclude the reasons set forth by the Board were sufficient. The city ordinance does not require more. Both the circuit court and this court have had no difficulty in reviewing the board's decision, the reasons stated and the record to determine a factual basis exists. We do not believe the May 1990 decision was unreasonable or arbitrary.

### April 11, 1991 DECISION:

We will now review the record of the April 11, 1991 decision of the Board. The Board granted the Olsons a new hearing because the proposed fire hall referred to earlier was relocated and a thirty-unit apartment complex was being constructed which would, in theory, act as a buffer between the Olsons' motel complex and the residential neighborhood. In addition, one neighboring resident had withdrawn his objection to the motel complex. The record from the previous hearing was incorporated into the proceedings. Again, testimony was received from opponents and proponents of the project. Again, concern was expressed by many residents over increased traffic and parking problems. In addition, opposition was expressed to gambling in the residential neighborhood. The Planning and Zoning Commission again recommended denial of the use-on-review permit.

The Board then commenced its proceedings. Various members of the Board stated their concerns. The primary concern was with the location of the motel in a predominately residential neighborhood. The Board denied the "use-on-review" permit without formally stating any reasons.

The circuit court remanded to the Board, requiring it to state its reasons for the second denial of Olsons' request. The Board submitted its reasons. The reasons set out by the Board were:

(1) That the use would be injurious to the use and enjoyment of the other property in the immediate [area] which has been residential in character.

(2) That the use would impede the normal and orderly development of the surrounding property for the residential uses predominate in the area and proposed public uses by the City of Deadwood.

(3) That there is inadequate access for a commercial venture of the size proposed by [the Olsons] for many reasons, including, but not limited to, the size, the legal issues of who would be responsible for the construction, maintenance, and liability and the confusion which would be created for the traveling public of [sic] a street going through an existing parking lot.

■ The Olsons contend it was an abuse of the trial court's discretion to remand to the Board to allow it to "rationalize" its decision after-the-fact. The Olsons ignore the fact that the city ordinance does not require the Board to record its reasons in the record or to make findings of fact in support of its conclusion. For that reason, the Board's failure to enter on the record

its reasons for denial did not render its decision arbitrary or capricious per se. *See South Maple Street Association,* 230 N.W.2d at 472; *Crane,* 122 N.W.2d at 524; *S. Loewenstein & Son,* 47 N.W.2d at 649. To require the trial court to simply set aside the Board's decision and remand for yet a third hearing would seem to be at best improvident, at worst improper. We conclude the trial court did not abuse its discretion in remanding to the Board to allow it to enter reasons for its decision.

■ We conclude two of the three reasons belatedly set out by the Board were supported by substantial evidence. We have already discussed the evidence supporting the Board's conclusion that the proposed motel and lounge would be injurious to the use and enjoyment of other residential property in the vicinity. In addition, we previously discussed evidence in the record which supports the Board's third reason, that access to the motel would be inadequate.

The second reason stated by the Board, that the use would impede normal and orderly development of the surrounding property for residential use and proposed public use, does seem speculative. We cannot conceive how permitting the construction of this motel would impede development of the area for residential purposes. More importantly, there is nothing apparent in the record to explain or support this finding. Nonetheless, because sufficient evidence exists to support other reasons stated by the Board, we conclude its decision to deny the Olsons' "use-on-review" permit was not arbitrary or unreasonable.

■ The Olsons also argue since only two of the three members of the Board who voted on the reasons for denial of the Olsons' permit actually were present at the April rehearing, the reasons adopted for the second denial should not have carried. SDCL 11–4–24 (1982) provides a concurring vote of at least two-thirds of the members of a governing body acting as a board of adjustment is required to reverse a decision made by a planning and zoning commission. Conversely, only one-third of the members need vote in favor of a decision to sustain it. The Deadwood Board consists of five members. Hence, if only two members vote for a decision, it is sustained. Generally, in absence of some indication that a voting member has informed himself of previous testimony and the record involved, it is not proper for a board member who was not present to hear testimony to vote on board decisions. *See* 4 Anderson, *supra,* § 22.46. However, the fact that one member of the three voting members voted to adopt reasons for the decision when that member was absent from the hearing in no way prejudiced the Olsons.

We affirm the circuit court's order dismissing the Olsons' petition.

MILLER, C.J., and SABERS and AMUNDSON, JJ., concur.

HENDERSON, J., specially concurs.

HENDERSON, Justice (specially concurring).

Although I agree that it appears there was "substantial evidence" to sustain the Board's decision, it would be better procedure to enter findings which would permit this Court to more adequately review a decision based upon the facts (as found) and the basic legal tenet(s) under which the Board took action. Re: *Appeal of David Fiori Realtor, Inc.,* 55 Pa.Commw. 59, 422 A.2d 1207 (Pa.Commw.1980). Nor should the language of a statute be parroted. Findings should be more explicit. 4 Anderson Law of Zoning, 822.44, p. 124–125 (3d Ed.1986). Indeed, the Board so theorized, too, for it belatedly entered its reasons for denial "after the fact." These reasons were, in essence, social upheaval to a residential neighborhood, traffic problems, inadequacy of access, impeding the development of the city's property, construction of a fire hall, and a creation of general congestion.

Deadwood must grow orderly, with the advent of its rebirth in the gaming industry, and to my way of thinking, the city fathers were attentive to that goal. These board hearings, as this panorama of rebuilding and change precipitates, cannot be empty gestures, nor can they be a rubber

stamp for a mere outlet of neighborhood opinion. A rule of law must prevail and, in my opinion, although I join the majority opinion, in the future the city of Deadwood should isolate its thinking into findings of fact in a more explicit manner. Thereby, this Court, or the circuit court, could review in a thorough and analytical manner.

Historical Note: The historic city of Deadwood, located in the Black Hills of South Dakota, was a mecca for early western frontiersmen. Some of the famous characters of the Old West were erstwhile residents of Deadwood. These characters included such notables as Wild Bill Hickock, Calamity Jane, Poker Alice, and Potato Creek Johnny. Deadwood is an old frontier town, nestled in Deadwood Gulch. It was opened to settlement because of the discovery of gold. Gambling flourished but was ultimately extinguished by prosecutorial edict, based upon interpretation of the then existing State Constitution. In 1988, the people of South Dakota, via initiative, changed the constitution of South Dakota.* *See*, S.D. Const. article III, § 25 which amended the State Constitution to provide:

> ... [I]t shall be lawful for the Legislature to authorize by law, limited card games and slot machines within the city limits of Deadwood, provided that 60% of the votes of the City of Deadwood approve legislatively authorized card games and slot machines at an election called for such purpose. The entire net Municipal proceeds of such card games and slot machines shall be devoted to the Historic Restoration and Preservation of Deadwood.

Per the initiative ballot, there were 197,745 votes for this amendment and 106,444 against it. Source: *see*, Historical Note, article III, § 25. Deadwood then resoundingly voted to turn the City of Deadwood into, once again, a gambling community. Population: 1,830 people; Source: 1990 Census Population and Housing by United States Department of Commerce, Bureau of Census, South Dakota State Library; judicial notice taken thereof. Gambling flourishes again in the old historic City of Deadwood, while legendary characters lie buried at the Mt. Moriah Cemetery, a United States flag perched above the city at the cemetery. It is a unique scene in America. With thousands of tourists and gamblers invading Deadwood, for a look at its history and beauty, plus a gambling yen, and with the buildings and houses crowded in this old gulch, cultural lag and social problems abound; and with it, a plethora of problems for the city fathers to solve. Preserve the old historic city, they are commanded by State Constitution to accomplish, yet take care of the new problems by virtue of the hundreds of thousands of people who pour into the gulch. It is an awesome task now. It was daunting to the earlier fathers in the days of Deadwood Dick and Calamity Jane. All asleep now at Mt. Moriah, it troubles them not.

* *See, Baker v. Jackson,* 372 N.W.2d 142 (S.D.1985) (South Dakota was the first state in the Union which approved a constitutional amendment reserving legislative powers to its citizens).