ALBERTS, Respondent

v.

MUTUAL SERVICE CASUALTY INSURANCE CO., Appellant

(123 N.W.2d 96)

(File No. 10022. Opinion filed August 8, 1963)

**Davenport, Evans, Hurwitz & Smith,** Sioux Falls, for Defendant and Appellant.

**Bogue & Rudolph,** Canton, for Plaintiff and Respondent.

HOMEYER, J. In a personal injury action plaintiff recovered judgment against one Berchel Anderson, an employee of the South Dakota Highway Commission, for $35,089.65 in damages and costs. This judgment was partially satisfied and plaintiff now seeks to recover the balance of the judgment from the defendant by a direct action on a policy of insurance issued to the South

Dakota Highway Commission. Judgment upon a jury verdict was entered for plaintiff and the defendant insurance company appeals from such judgment.

At the time of the accident in which plaintiff sustained personal injuries, the defendant had in force a public liability and property damage policy insuring the South Dakota Highway Commission which by attached rider provided that if the insured interposed the defense of sovereign immunity the insurance coverage provided by the policy was available to the employees of the insured in their capacity as such. The personal injury action was started against Anderson and the South Dakota Highway Commission and before trial dismissed as to the Commission on assertion of the mentioned defense.

The principal assignment of error pertains to scope of employment. It is claimed that Anderson at the time and place of the accident was acting without authority or in excess of authority and consequently not entitled to the insurance protection accorded employees of the highway commission and that defendant's motions for directed verdict and for judgment notwithstanding verdict should have been granted.

■ The liability of an employer for the tortious acts of its employees rests upon the doctrine of respondeat superior and an employer is not liable unless the employee is acting within the scope of his employment. Antonen v. Swanson, 74 S.D. 1, 48 N.W.2d 161, 28 A.L.R.2d 1; Morman v. Wagner, 63 S.D. 547, 262 N.W. 78.

■ The general rule applicable on what conduct is within the scope of employment is set forth in 57 C.J.S. Master and Servant § 570 d (2) wherein it is said "that conduct which the master has specifically directed is within the scope of the servant's employment, but it is not essential that the conduct be specially authorized by the master. It is enough that it is impliedly directed or authorized by the master, or is of the same general nature as that authorized, or is incidental to the conduct authorized. In determining whether or not a servant's conduct, although not specifically directed or authorized, is impliedly authorized or incidental to the conduct authorized, the surrounding facts and

circumstances, together with the nature of the employment and the conduct of the employee, will be considered. A servant has implied authority to do what is usual, customary, and necessary to fulfill the duty intrusted to him by the master, and accordingly an act is within the scope of a servant's employment where it is reasonably necessary or appropriate to accomplish the purpose of his employment, and intended for that purpose, although in excess of the powers actually conferred on the servant by the master."

 ▮ Conduct of a servant is within the scope of employment if "(a) it is of the kind he is employed to perform, (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master * * * ." American Law Institute, Restatement, Agency 2d, § 228(1). Conduct of the servant may be within the scope of his employment, although not intended or consciously authorized by the master, but Id. § 229, "(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, **or incidental to the conduct authorized,** (emphasis ours) (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether or not the act is outside the enterprise of the master or, it within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result; and (j) whether or not the act is seriously criminal." An act may be within the scope of employment even though forbidden or done in a forbidden manner, Id. § 230, or consciously criminal or tortious. Id. § 231. For applications of these principles generally see Morman v. Wagner, 63 S.D. 547,

262 N.W. 78; Anderson v. Chicago & N. W. Ry. Co., 59 S.D. 543,241 N.W. 516; Hasche v. Wagner, 55 S.D. 595, 227 N.W. 66 and cases cited under the quoted sections in American Law Institute, Restatement, Agency 2d, Appendix.

■ The servant may also be within the scope of his employment in using an instrumentality not expressly authorized to effect a result which he has been ordered by the master to accomplish where the means are not specified, American Law Institute, Restatement, Agency 2d, § 239; Texas Power & Light Co. v. Denson, Tex.Civ.App., 45 S.W.2d 1001; Guitar v. Wheeler, Tex.Civ. App., 36 S.W.2d 325, and no other means are available, Cumming v. Automobile Crankshaft Corporation, 232 Mich. 158, 205 N.W. 133, or if the means available are not in operating condition. Husted v. French Creek Ranch, 79 Wyo. 307, 333 P.2d 948. For "If the master directs a servant to accomplish a result and does not specify the means to be used, the servant is authorized to employ any usual or suitable means." American Law Institute, Restatement, Agency 2d, § 239, comment (a). In short, authority may be implied from necessity.

The cases on a master's liability and nonliability for the tortious acts of his servant are legion and virtually all, more or less, embody varying applications of the general principles enumerated above. We believe no useful purpose would be served in discussing any of the many cases on this subject. Suffice to say as the North Dakota Court did in Hoffer v. Burd, 78 N.D. 278, 49 N.W.2d 282, that each case depends on its own facts and circumstances.

■ Viewing the evidence and all reasonable inferences therefrom in a light most favorable to plaintiff, as we are required to do, we recite the facts and circumstances we deem pertinent. Berchel Anderson on the date of the accident, August 8, 1960, had been for about 5½ years a continuous employee of the South Dakota Highway Commission, classified as a light equipment operator, working out of the Hurley maintenance station in Turner County. There were four employees at the Hurley station and their duties were to maintain all state roads in that county. One of the employees, Albert Dangel, had been designated a working foreman who kept time sheets and exercised minor su-

pervisory control over the other employees, but in general all employees performed substantially the same tasks. In winter months, most of the work involved snow removal and in the summer mowing weeds, with some time spent in hauling gravel, patching roads, and doing similar maintenance work. During the weed-cutting season Anderson spent virtually all of his time mowing weeds and in early summer he and another employee had each been assigned a mower and given general instructions to cover the whole maintenance area, to cut to a certain height and to keep the mower in repair and operating condition. On the day of the accident, Dangel and a fourth employee were in separate gravel trucks in the Beresford area. Beresford is about 30 miles from Hurley. Dangel's truck had a two-way radio and could be contacted via highway patrol radio from Parker. He could not be contacted from Hurley. The Hurley maintenance station had no telephone, but a toll call could be placed to the highway patrol radio, who could then talk via short-wave to Dangel, and the information could be relayed to Hurley by a toll call from Parker.

On the day of the accident, Anderson began mowing weeds about 7:00 a.m. and had a mower breakdown about one hour later. He returned to the Hurley station which was absent other employees and the needed repair part was not in stock, so he utilized the only state-owned conveyance available, being a 1947 or 1948 oil distributor truck, and drove by direct route to the Sioux Falls Highway shop distant about 35 or 36 miles, obtained a repair part and returned directly to Hurley and discovered that he had been given the wrong part. The evidence shows that the state truck was old, in poor repair, and had heated on the trip believed to have been caused by a clogged radiator. Anderson ate his lunch, then went to his home a few blocks away, took his own automobile, a 1953 Chevrolet, drove directly to Sioux Falls, obtained the correct repair part, and was returning by direct route to Hurley when involved in the accident in which plaintiff was injured. The repair part was in his car when the accident occurred. It is undisputed that Dangel had no knowledge of the mower breakdown and found no knowledge that Anderson had made the first trip to Sioux Falls in the state-owned oil distributor truck or the second trip in his own automobile. It is also undis-

puted that Anderson made no attempt to contact Dangel before making either trip.

Anderson testified that it was the practice and custom if there was a mower breakdown, that it would be fixed by him, if possible, and if the parts were at the Hurley station; if it was not possible for him to fix it, the mower would be hauled to a shop where it could be fixed; and if it could be fixed by him, and he didn't have the parts, he would go after the parts. This general practice applied to all employees when there was a breakdown of equipment. Dangel knew of this practice and Anderson had never been instructed that prior authorization from him was necessary; that Anderson had gotten repair parts outside Hurley before the accident date, but had never used his own automobile before. Anderson was not permitted to testify as to places outside of Hurley where he had obtained repair parts and likewise testimony from a former State Highway Department employee doing similar maintenance work on use of his own automobile without making claim for reimbursement was not permitted. Dangel had not told Anderson where he would be on the day the accident happened, but Anderson knew from roundabout conversation that he expected to be in the Beresford area; he gave no specific instructions on what to do in case of a mower breakdown. Anderson had never been directed not to use his automobile in his work and knew of no prohibition of such use. He also testified that he believed it was customary for employees in his capacity to use their own automobiles in highway department work and this custom existed in case of emergency and there was no available vehicle for use when a part was needed or whatever had to be done. Anderson reported the accident to Mr. Lord in charge of the Mitchell headquarters of the highway department by mail the day after the accident. He was paid for the day of the accident, drew sick pay and was retained in the employ of the highway department after his hospital release. In response to a direct question: "Now, what was the reason for your taking your own car rather than the truck that you took in the morning?", Anderson answered: "Well, I was afraid that this old truck wouldn't get me to Sioux Falls and back again."

Dangel testified that he did not give Anderson authority to

go to Sioux Falls that day and Anderson did not request permission but on prior occasions he had given authority to Anderson and others to go after parts at places other than Hurley, and that there was no certain "way" as to who was to go after parts and it was attempted to be passed around evenly among the employees; that on occasion he used his own private car on state business; that none of his trips exceeded five miles; that he had never told Anderson not to use his car on state business; that he never saw any written regulations restricting use by employees of their private automobiles on state business; that it was the duty of the operator of the mower to keep it in repair; that the operator of the mower would use it throughout the mowing season and was accountable for it.

We treat the South Dakota Highway Commission in all respects as a non-immune employer. The Commission is charged with the vast and cumbersome duty and responsibility of constructing and maintaining state highways in South Dakota. It operates from a central Pierre headquarters with district offices and county stations located throughout the state. The governor is an ex-officio member of the Commission and there are hundreds of highway department employees with many and varied duties and at the foot of this labyrinth of activity is the maintenance employee at the county station. By nature of this vast operation and the character of the work to be performed, it is obvious that limited supervision and direction is supplied to an employee such as was Berchel Anderson on the date of the accident.

■ Anderson's employment was to maintain roads in Turner County, and at the season of the accident, it was to mow weeds. Incidental to this employment was the proper maintenance and repair of the mower used by him exclusively in the performance of his work. A certain amount of discretion of necessity was lodged in him. This is apparent from the testimony of Dangel, the working foreman, and from Anderson's testimony. There were no detailed instructions on what to do in case of a breakdown, but it is obvious that Anderson was expected to get the mower repaired as expeditiously as possible and return to the mowing operation. This he attempted to do. The closest place where he

could obtain a needed repair part was at the highway department shop in an adjoining county. Apparently there were three state-owned vehicles which could have provided transportation, but two of these were elsewhere removed at a considerable distance from Hurley. The third was an old oil distributor truck. Knowing this, and it being apparent from the testimony that only with difficulty and a doubtful possibility that Dangel could be contacted, he exercised a discretion and used the old truck to go to Sioux Falls to get the repair part. His conduct to this point it is conceded would have raised a jury question as to his implied authority to use the old truck and make the trip to Sioux Falls. Anderson discovered he had the wrong part when he returned to Hurley and again faced with the uncertainty of a successful contact with Dangel, and having learned that the old truck was not operating properly, he used his own car to make a second trip during which the accident happened. The evidence establishes no prohibition to the use of personal cars on state business and no orders or directions from Dangel or any superior employee of the highway department as to what should be done in a similar situation. Under these facts and circumstances, we conclude that reasonable minds could differ and it was for the jury to decide whether or not Anderson had implied authority to use his own car to make the trip to Sioux Falls for the repair part. In our modern industry, the use of a car by an employee who owns one to perform tasks incidental to his employment has become so normal that implied authority for such usage is readily accepted. See Boynton v. McKales, 139 Cal.App.2d 777, 294 P.2d 733.

We have considered the travel regulations issued by the State Board of Finance which were received in evidence. These pertain to reimbursable travel expense. We conclude that travel authorization as therein set forth was not intended to apply to circumstances present when Anderson used his personal car and this accident occurred. No travel reimbursement was contemplated by Anderson when he made this trip.

■ ■ The trial court instructed that if Anderson was acting with authority, either express or implied, or if not so acting, if his acts were ratified, plaintiff could recover. Error is claimed con-

tending there was no competent evidence to support ratification. The evidence shows that Almer O. Steensland was Comptroller and Personnel Director of the South Dakota Highway Department on August 8, 1960, and in general charge of hiring and discharging employees in the category of Berchel Anderson. On that day he received a report of the accident from Motor Patrolman Eide, another state employee, who investigated the accident. He later talked with the motor patrolman personally. He also had conferences and discussed the matter with Mr. McKellips, the highway director, Mr. Ihli, the state maintenance engineer, Mr. Goetz, the safety director, Mr. Lord and Mr. Hillmer, of the Mitchell district headquarters, who were respectively the maintenance supervisor and district engineer in the area which includes Turner County. Anderson had reported the accident to Mr. Lord. These men were all state employees charged with duties administrative and otherwise. So far as pertinent to ratification the material facts were knowledge by the employer that Anderson was mowing weeds, that he had a breakdown, that the repair part was not at Hurley, that he went to the highway shop at Sioux Falls for the repair part, that he used the state-owned oil distributor truck on the first trip, that he made a second trip and used his own car to speed the trip, that the accident occurred while returning to Hurley on the second trip. The evidence taken as a whole supports these facts and they were communicated to the personnel director by various state employees having knowledge thereof. The personnel director with knowledge of these facts determined that Anderson had acted properly in the discharge of his duties, that he should not be discharged but kept on the payroll. The gist of the objection to the testimony of Steensland was to the effect that the approval of the acts of Anderson was based on information supplied by others and hearsay. We believe there was no error in the receipt of this evidence. Technically and narrowly considered it might be regarded as emerging from hearsay, but first-hand knowledge is not always practicable or an invariable rule of evidence. In large business operations, much of what officials learn is obtained through conferences and conversations with employees, business reports and records, and similar means of information. Cross-examination of the testifying officer and his duties may be used to test his knowledge and the probability of error in accuracy of the information

obtained. The weight accorded to his testimony is for the jury. Transcontinental Petroleum Co. v. Interocean Oil Co., CCA, 8th Circuit 262 F. 278. We add Anderson as a subsequent witness testified in confirmation of the material facts which form the basis of the employer's approval and claimed ratification.

 It is contended that the court erred in permitting Steensland and Anderson to testify to a custom of South Dakota Highway employees using their private cars on state highway business. The objection was made that there was no sufficient foundation for this testimony and that it was immaterial which was overruled and motion to strike was denied. Steensland's testimony was predicated upon an examination of expense vouchers that cleared through his office. Anderson testified that it was customary for employees such as he and Dangel to use their own cars on state highway business "in the case of an emergency when there was no available vehicle around, we'd go get a part— or whatever business we had." The evidence does not show that he had used his car before. This testimony should not have been permitted and the motion to strike should have been granted. Evidence of custom is admissible to prove a fact issue if proper connection is established, but it must appear that the usage or practice is so general that the parties are presumed to have knowledge of it. 20 Am.Jur., Evidence, § 333. "Where custom, habit, or practice in business is to be relied upon as tending to establish an alleged fact, and such custom, habit, or practice are to be established by specific instances, they must be numerous enough to base an inference of systematic conduct. They must also have occurred under substantially similar circumstances, so as to be naturally accountable for by a system only, and not as casual recurrences. They must be such as to indicate a general course of conduct. * * * It is the regularity of such instances tending to manifest a uniform mode of dealing that gives probative value." Union Central Life Ins. Co. v. Star Ins. Co., 178 Minn. 526, 227 N.W. 850. Error may not be presumed on appeal and appellant has the burden of showing not only error but prejudicial error. "To show such prejudicial error an appellant must establish affirmatively from the record that under the evidence the jury might and probably would have returned a different verdict if the alleged error had not occurred." Dwyer v. Christensen, 77

S.D. 381, 92 N.W.2d 199. Considering the evidence as a whole we conclude that no prejudicial error resulted from the receipt of this evidence or denial of motion to strike.

 Steensland on direct examination was asked if he had knowledge as to whether or not there was any directive, written or oral, prohibiting state employees from driving their personal vehicles on state business and he answered in the negative after an objection that it was immaterial. Steensland was not a party to the lawsuit and his knowledge of such directive would be immaterial. The court erred in not sustaining the objection. However, we conclude that the error was without prejudice, 3 Am.Jur., Appeal and Error, § 1026, p. 576, since Steensland later testified that there was no such regulation. Evidence received though inadmissible which tends to be cumulative is generally deemed to be nonprejudicial. See Schoenrock v. City of Sisseton, 78 S.D. 419, 103 N.W.2d 649.

 Steensland testified that from the information obtained through reports and otherwise, and after conference with other administrative officers and employees of the highway department, a decision was made that "he (Anderson) acted properly in the discharge of his duty, and he should not be discharged, and he was kept on the payroll." Objection was made to this testimony as immaterial, based upon hearsay, and that there was a writtten report (decision). The objection was overruled and a subsequent motion to strike was denied. It does not appear that any written decision on this matter was ever made. Steensland testified that reports of the accident were made to him in routine administrative procedure, but he did not testify as to contents. The fact that he received the reports and that an administrative decision was made is not hearsay. Likewise, the decision is not opinion evidence. As we have stated, the acts of Anderson were subject to ratification, and Steensland as personnel director of the highway department was qualified to testify to an administrative approval. There was no evidence that there was a written decision or higher evidence and the defendant offered no proof that there was higher evidence in existence. 32 C.J.S. Evidence, §§ 780, 782. Oral evidence of the approval under the circumstances was proper. Renville State Bank v. Kinsberg, 40 S.D. 191, 166

N.W. 643. See also Dacotah Packing Co. v. Bertelson, 52 S.D. 324, 217 N.W. 393.

Other assignments of error pertain to instructions. We have considered the instructions as a whole and conclude that they fully and correctly state the law applicable to the case.

Judgment affirmed.

All the Judges concur.