Amanda THOMPSON, Special Administratrix of the Estate of Thomas William Thompson, a/k/a Tommy Thompson, Deceased, Plaintiff

v.

UNITED STATES of America, Defendant.

No. CIV. 78–3005.

United States District Court, D. South Dakota, C. D.

Dec. 31, 1980.

---

David Stanton, Rapid City, S.D., for plaintiff.

John J. Ulrich, Asst. U. S. Atty., Sioux Falls, S.D., for defendant.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### CASE SUMMARY

Plaintiff filed her complaint as the special administratrix of the estate of Tommy Thompson under the Federal Tort Claims Act, alleging that the United States was liable for the wrongful death of her son. After trial of this case, the Court finds that the evidence has established all the elements of an FTCA action: that the person responsible for the decedent's death was a government employee within the meaning of the FTCA, that the killing took place within that employee's scope of office, and that the death was the result of that employee's negligent act. This Court therefore holds that defendant is liable in the amount of $35,000 for pecuniary damages resulting from this death.

## FACTUAL BACKGROUND

The facts of this case are dismayingly simple. On July 12, 1975, Benjamin Kitteaux was a CETA trainee employed by the Crow Creek Sioux Tribe as a police officer. On that day, while Kitteaux was on duty, he entered the police station of the Bureau of Indian Affairs (BIA) United States Department of the Interior, where the tribal police were headquartered, drew his gun, and pointed it at Tommy Thompson. Kitteaux then put the gun down alongside his holster, and in a simulation of a "fast draw", pulled the gun up again. This appears to have been a frequent practice of his. This time, however, the gun fired, the bullet struck Thompson in the chest, and Thompson died.

Slightly more than one month later, on August 25, 1975, Kitteaux came before this Court, and on his plea of guilty, was convicted of involuntary manslaughter, 18 U.S.C. § 1112. The judgment found that he pointed "a loaded firearm at Tommy Thompson, without due caution and circumspection, and as a result the firearm did discharge, which caused the death of said Tommy Thompson...." *United States v. Benjamin Charles Kitteaux*, CR. 75–3108.

An administrative claim for damages resulting from Thompson's death was filed with the Department of the Interior, and was denied. Thereafter, suit was filed against the United States under the Federal Tort Claims Act.

## DISCUSSION

### I.

### *Government Employee*

██ A major point of contention at the trial was whether Benjamin Kitteaux was an "employee of the government" within the meaning of the FTCA. Pointing to the facts that tribal policemen were officially hired by the Tribal Council, paid by the Tribe, and were officially fired by the Tribal Council, the government insists that Kitteaux could in no way be considered as one of its employees. Further, the government cites a substantial amount of case law to the effect that, although Kitteaux's pay as a CETA trainee derived ultimately from the federal government, the federal source of his pay does not convert Kitteaux into a federal employee. *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). This latter contention is quite correct. The holding in *Orleans* does not, however, dispose of this issue. As *Orleans* holds, the crucial question to be determined is not the source of the funding, "but whether [the employee's] day-to-day operations are supervised by the Federal Government". 425 U.S. at 815, 96 S.Ct. at 1976. When the evidence as to who was responsible for the day-to-day supervision of the Tribal policemen is assessed, Benjamin Kitteaux unquestionably emerges as a full-fledged FTCA "government employee".

First, the evidence presented at the trial clearly establishes that applicants for the positions of tribal policemen applied to the BIA police captain, William Long, not directly to the Tribe. Long then passed along his recommendation, and the Council would act on it, generally following his recommendation. If the application was made between Council meetings, Long could hire an applicant pending Council action.

Second, the indoctrination, the giving of the oath, and supplying of the gun were all done by BIA officials. The tribal policemen—there were about two during this time period—headquartered at the BIA police station. Their supervision and training was done by the BIA in conjunction with FBI firearms training. The duties and shifts were laid down by their BIA supervisors. This would need to be the procedure, for the Tribal Council had not designated anyone to be in charge of its Tribal police. In point of fact, one BIA official at the trial admitted that the BIA used these CETA police trainees as a way of hiring people without the BIA itself having to budget the funds to do so. The official further conceded that these Tribal policemen were looked at as potential BIA officers and, in fact, the trainees were routinely cross-deputized as BIA officers.

Finally, the BIA officials also had the power to fire trainees in case of misbehavior.

The statutory definition of government employee under the FTCA at 28 U.S.C. § 2671 includes "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." Even without other authority, this Court would not hesitate to find that the CETA Tribal police trainees were "government employees" within the meaning of the FTCA, but the case law also compels this decision.

The case of *Martarano v. United States*, 231 F.Supp. 805 (D.Nev.1964), comes closest to the facts of this case. *Martarano* involved a man who was hired by the State of Nevada, paid by the State, and received all fringe benefits of employment through state agencies, but whose activities were supervised by federal officials as part of a predator and rodent control program. "The job description, proficiency ratings and actions pertaining to pay increases . . . were supplied, reviewed and approved by [federal officials] . . . No employee or officer of the State of Nevada directed or supervised [the employee] in the performance of his work." 231 F.Supp. at 807. The court, in finding the United States liable for his negligence in a vehicle collision in the course of his employment, said that the worker was "held to be an employee of the government because he was officially loaned to a federal agency and was working under the direct supervision and control of the federal agency." 231 F.Supp. at 808. *See also United States v. N.A. Degerstrom, Inc.*, 408 F.2d 1130 (9th Cir. 1969); *Logue v. United States*, 412 U.S. 521, 531, 93 S.Ct. 2215, 2221, 37 L.Ed.2d 121 (1973). The control which the federal government, acting through the BIA, exercised over Kitteaux's day-to-day activities as a CETA Tribal police trainee was clearly sufficient to make Kitteaux a "government employee" under the FTCA.

## II.

### Scope of Employment

■ It is not enough to show that a particular individual was an employee of the United States at the time an accident occurred; a plaintiff must also show that at the time of the injury, the employee was "acting within the scope of his office or employment." 28 U.S.C. § 1346(b). This must be determined by the law of the state where the act occurred. *Williams v. United States*, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955); *Cruikshank v. United States*, 431 F.Supp. 1355, 1358 n.6 (D.Hawaii 1977).

■ The law of South Dakota on this point is reasonably clear. The employer-master is liable for "the acts of the servant, within the general scope of his employment, while engaged in his master's business, and *done wtih [sic] a view to the furtherance of that business and the master's interest . . . even though the acts be done wantonly and wilfully. . . ."* *Skow v. Steele*, 49 N.W.2d 24 (S.D.1951). (Emphasis supplied)

In *Skow*, for example, the facts were that defendant had sent his brother onto the farm defendant rented to plaintiff to supervise the shelling of corn. Plaintiff protested, and defendant's brother assaulted plaintiff. Upholding the jury verdict against the defendant employer, the court stated that whether the assault occurred in the scope of the employee's office was an issue for the finder of fact.

This is so because the servant's motive is usually a material issue. Thus in this case the real question presented is whether [the servant] committed the assault as a result of his desire to [carry out the master's business], or whether he assaulted plaintiff simply to effect some purpose of his own.

49 N.W.2d at 26. *See also Hasche v. Wagner*, 55 S.D. 595, 227 N.W. 66 (1929); *Waaler v. Great Northern Railway Co.*, 22 S.D. 256, 117 N.W. 140 (1908); *United States v. Lushbough*, 200 F.2d 717 (8th Cir. 1952).

Can it be said that Kitteaux was acting within the scope of his employment when Thompson was killed? Kitteaux was on

duty at the time, within the confines of the BIA police station, armed with his BIA-issued gun. This leaves the question of his *motive* in leveling his gun at Thompson, which *Skow* indicates is particularly one for the finder of fact. To reach a determination of this matter, one must consider the context in which the act took place.

Kitteaux was a recently hired police trainee. As a part of his training as a policeman, he was given firearms training by a Special Agent of the FBI, David Powers. This training includes, as Powers testified, extensive instruction of "quick draw." Given this background, and the circumstances with which Kitteaux was surrounded on the day the shooting occurred, the Court must draw the inference that, though tragically misguided, Kitteaux's motive in pulling his gun up and pointing it at Thompson was to practice and perfect his police firearms techniques. In this unfortunate way, Kitteaux evidently intended to improve himself as a policeman, and to thereby carry out his employer's business. It could not be contended that if a similar accident had occurred on a firearms range, in the course of firearms practice by a government employee, the United States would not be liable. Simply because the situs of the practice is moved from a range to the interior of a BIA police station, the result is not changed.

■ Defendant complains that such behavior was strictly forbidden. Whether it was forbidden or not does not allow defendant to escape liability, for the law is plain that an "act may be within the scope of employment even though forbidden or done in a forbidden manner...." *Alberts v. Mutual Service Casualty Insurance Co.*, 80 S.D. 303, 123 N.W.2d 96, 99 (1963), citing Restatement, Agency 2d § 230. As Prosser said, if a master could escape liability by ordering his servant to act carefully, few employers could ever be held liable. "If the other factors involved indicate that the forbidden conduct is merely the servant's own way of accomplishing an authorized purpose, the master cannot escape responsibility no matter how specific, detailed and emphatic his orders may have been to the contrary." Prosser, Torts, 461 (4th ed. 1971). As made clear before, Kitteaux's "practice" on Thompson was Kitteaux's way of perfecting his mastery of his gun, a goal which Power's testimony shows was highly desired, even if Kitteaux's way of doing it may have been forbidden. It is thus the ruling of this Court that the shooting which took Tommy Thompson's life occurred in the scope of Benjamin Kitteaux's office as a federal employee.

### III.

### *Negligent Act*

■ Defendant contends that this shooting was "predominantly" intentional, and so barred by 28 U.S.C. § 2680(h). This argument needs no extensive refutation. Kitteaux pled guilty to the charge of "killing a human being while in the commission of a lawful act *without due caution and circumspection", See* 18 U.S.C. § 1112 (emphasis supplied) and this Court accepted the plea. No clearer proof that Thompson's death was the result of Kitteaux's negligence is required.

### IV.

### *Damages*

The evidence at trial indicated that Thompson was twenty-five at the time of his death in 1975. He was single, living at home, and according to his mother, contributed about $200 a month toward the support of his family. His mother's testimony on cross-examination, however, indicates that the usual amount of monthly support was somewhat lower, generally in the approximate amount of $120. It appears that he usually had a job. His mother testified that he helped with the housework, occasionally cooked dinner, and helped to raise the other children of the family, three or four of whom were under eighteen in 1975. She stated that Thompson always said he would continue to help her.

Thompson's mother was born in 1921, his father in 1920. The father was described as suffering from a serious drinking problem, while his mother is afflicted by rheumatoid

arthritis. The father appears to contribute very little support to the family. His mother's monthly income from her job is about $300. She will be eligible for social security when she retires, though the amount of her benefits are unknown.

Taking notice of the Life Expectancy Tables in the 1979 American Jurisprudence 2d Desk Book, it appears that Tommy Thompson himself, as a non-white, would have had a life expectancy of about 41.6 more years at the time of his death. His mother's life expectancy in 1975, as a non-white, was approximately 25 years, while his father's life expectancy was about 19 years.

While SDCL 21–5–7 limits recovery in wrongful death actions "to the pecuniary injury resulting from such death to the persons ... for whose benefit such action shall be brought," this has been held to include compensation for the deprivation of a deceased child's advice, assistance and protection. *Anderson v. Lale*, 88 S.D. 111, 216 N.W.2d 152 (1974) (Per Doyle, J., one J. concurring, one J. concurring in result only, two JJ. dissenting); *Halvorsen v. Dunlap*, 495 F.2d 817 (8th Cir. 1974); *also see Gilbert v. Root*, S.D., 294 N.W.2d 431 (1980).

■ It is proper, in an action of this kind, to consider the beneficiaries' financial condition as it bears on the likelihood that the child will continue to provide support. *Stratton v. Sioux Falls Traction System*, 55 S.D. 464, 226 N.W. 644 (1929). Further, the evidence that Thompson consistently contributed support to his mother before his death justifies the inference that he would have continued to do so to some extent. *Bottum v. Kamen*, 43 S.D. 498, 180 N.W. 948 (1921).

Plaintiff also seeks damages for Thompson's pain and suffering from the time he was shot to the time he died. While such damages are recoverable in a cause of action separate from that for wrongful death, *Pexa v. Clark*, 85 S.D. 37, 176 N.W.2d 497 (1970); *Simons v. Kidd*, 73 S.D. 41, 38 N.W.2d 883 (1949); *Rowe v. Richards*, 32 S.D. 66, 142 N.W. 664 (1913), and there was testimony indicating that Thompson was alive following the shooting, there was no showing that Thompson was conscious, if anything in the testimony suggested that he was unconscious. "[T]here can be no recovery for pain and suffering while an injured person is unconscious and damages are only allowable for such time as the injured person is conscious." *Plank v. Heirigs*, 83 S.D. 173, 156 N.W.2d 193, 200 (S.D. 1968). It was also established at trial that neither Thompson's estate nor his mother paid Thompson's hospital or funeral bill, but that these were paid by the Crow Creek Sioux Tribe.

■ Taking all the permissible evidence into account, then, this Court finds the pecuniary damage suffered by Thompson's beneficiaries to be in the amount of $35,000, and judgment will be entered against defendant in that amount.

This Memorandum shall constitute this Court's Findings of Fact and Conclusions of Law.