Unified Judicial System

 

 
 Formatting provided courtesy of State Bar of South Dakota and South Dakota Continuing Legal Education, Inc.
222 East Capitol Ave.
Pierre, SD 57501-2596 
SOUTH DAKOTA PUBLIC ENTITY POOL FOR LIABILITY,
a/k/a South Dakota Public Assurance Alliance,
a Local Government Risk Pool,
Plaintiff and Appellant,
v.
THOMAS D. WINGER and MICHAELEA WINGER,
Defendants and Appellees.
[1997 SD 77, __ NW2d __ ]
South Dakota Supreme Court
Appeal from the Seventh Judicial Circuit, Pennington County, SD
Hon. Roland E. Grosshans, Judge
#19699 â Reversed
James S. Nelson, Mark J. Connot
Gunderson, Palmer, Goodsell & Nelson, Rapid City, SD
Attorneys for Appellant.
Michael A. Wilson, Quinn, Eiesland, Day & Barker, Rapid City, SD
Attorneys for Appellees.
Argued on Jan 14, 1997; Opinion Filed Jul 2, 1997
 
KONENKAMP, Justice.
 [Â¶1] Thomas Winger, a Pennington County Highway Department crew leader, spent most of his evening sightseeing and going to bars before his 9:43 p.m. motorcycle accident while on his way home. Amid these excursions, he inspected a job site. As an "on call" employee, was he acting "within the scope of employment" and "on behalf of or in the interest of" his employer at the time of the accident, entitling him to underinsured motorist coverage? We conclude his deviations were substantial, thus precluding coverage, and reverse the circuit courtâs ruling to the contrary.
FACTS
 [Â¶2] The South Dakota Public Entity Pool for Liability (PEPL Fund), also known as the South Dakota Public Assurance Alliance (SDPAA), provides underinsured motorist coverage for employees injured in the scope of employment and while acting on behalf of or in the interest of their employers. On Friday, June 14, 1991, his day off, Winger spent most of his time at home with personal activities. In his initial testimony, he left home on his motorcycle sometime between 6:15 p.m. and 7:00 p.m. to check a highway project on Nemo Road. Part of the road had washed out from flooding and the barricades needed to be checked regularly. Jack Dier, Wingerâs supervisor, had instructed Winger to inspect the site after-hours and on his days off, authorizing him to use his personal vehicle to do so.
 [Â¶3] Before he went to the Nemo site, however, Winger drove to Skyline Drive to watch the sunset. He lingered there at least an hour. After leaving Skyline Drive, he drove through Canyon Lake Park. He then proceeded back through Rapid City looking for a fellow employee, Rob Rolof. Winger drove by the Time Out Lounge, but not seeing Rolofâs motorcycle outside, he did not stop. Finally, at 8:30 p.m., he reached the Nemo site and checked the lights and barricades. He then headed back to Rapid City, and, at approximately 9:00 p.m., arrived at the Buck âN Gator Bar. He stopped there to look for Rolof to delegate to him the task of checking the site. Rolof was not there, but Winger stayed and drank half a beer. [fn1]  After fifteen minutes or so, another County employee came in and began to complain about work, so Winger left. [fn2]  He then conversed about his motorcycle with an unknown man in the parking lot for fifteen to twenty minutes. At approximately 9:40 p.m., he left for home. On the way, he was involved in a collision with another motorist. At the emergency room, he told a nurse he had consumed four beers about 9 p.m. that evening. [fn3] 
 [Â¶4] After a trial to the court, Winger on his own revealed he and his wife had testified falsely. The court ordered supplemental depositions. In their amended testimony, Winger and his wife said that after she returned home from work that evening, he told her he had to go check on the Nemo site. They argued about why he was not staying home with his family. He left the house shortly after 6:00 p.m. bound for the Blue Lantern Bar. It took five minutes to get there, and, as he walked in, the phone was ringingâhis wife was calling. He spoke to her for a minute, hung up, and left. Winger testified he went to the Blue Lantern to find Rolof, but in previous testimony he said the idea of finding Rolof did not occur to him until well after sunset when he left Skyline Drive. LuAnne Saenger, the Blue Lanternâs manager and a long-time acquaintance of Wingerâs, did not recall the phone call. She said Winger seemed in a good mood that night, remaining for thirty to forty-five minutes and drinking two beers. After leaving the Blue Lantern, he stopped to fill his gas tank before going to Skyline Drive. The rendition after this point remained the same as in earlier testimony.
 [Â¶5] The trial judge entered a declaratory judgment in favor of Winger. [fn4]  SDPAA appeals. Was Winger acting "within the scope of employment" and "acting on behalf of or in the interest of" Pennington County at the time of the accident? We are also asked to decide if there is support in the record for the courtâs finding Wingerâs alcohol consumption had no effect on the accident.
STANDARD OF REVIEW
 [Â¶6] In declaratory judgment actions, our standard of review of factual questions is clearly erroneous. Northwestern Bell Telephone Co. v. Stofferahn, 461 NW2d 129, 134 (SD 1990). Conversely, questions of law are reviewed de novo, Schuck v. John Morrell & Co., 529 NW2d 894, 896 (SD 1995), as are mixed questions of law and fact. Paulson v. Black Hills Packing Co., 1996 SD 118, Â¶7, 554 NW2d 194, 196. We also review deposition testimony de novo. Tischler v. UPS, 1996 SD 98, Â¶23, 552 NW2d 597, 602; Hendrix v. Graham Tire Co., 520 NW2d 876, 879 (SD 1994).
ANALYSIS AND DECISION
 [Â¶7] The provisions of the public entity pool, or PEPL Fund, govern this dispute: "The purpose of this program is to provide a fund as the sole source for payment of valid tort claims against all member public entities of the state and their officers and employees for all liability they may incur based upon negligence in the operation of motor vehicles or negligence in performing other acts within an employeeâs scope of employment ... ." SDCL 3-22-1 (Emphasis added). "Scope of employment" is defined as "any activity that an employee performs or incidental to any activity to be performed regardless of the time and place of performance and ... regardless of whether the activity is construed or defined as ministerial, discretionary or proprietary." SDCL 3-22-2(13).
 [Â¶8] Under the contract for PEPL coverage, an employee must be "acting on behalf of or in the interest of the public entity" at the time of the accident. Underinsured motorist coverage is included. Farmland Ins. Companies v. Heitmann, 498 NW2d 620, 624 (SD 1993); see, e.g., SDCL 58-11-9.4 & 58-11-9.5. Though ambiguous insurance contracts must be liberally construed in favor of the insured, construction cannot be forced when the language is plain and unambiguous. St. Paul Fire & Marine Ins. v. Schilling, 520 NW2d 884, 887 (SD 1994).see generally In re Request for Opinion of Supreme Court, 379 NW2d 822 (SD 1985). However, coverage concepts are similar to insurance, so we apply the same general principles. [fn5]  We resort to workersâ compensation cases because those decisions are useful in exploring the themes surrounding scope of employment questions. Yet we are not bound here to liberally construe coverage as we are in workersâ compensation matters. See, e.g., Egemo v. Flores, 470 NW2d 817, 824-25 (SD 1991). See 12 Couch Cyclopedia of Insurance Law Â§45.565 (2ded 1981). See also Getlin v. Maryland Cas. Co., 196 F2d 249, 251 (9thCir 1952)(construing employee coverage under a liability policy and noting "[w]e should set aside at once the various cases involving workmenâs compensation acts ... . These cases involved the entirely justifiable effort on the part of the courts to bring cases under the coverage of the compensation act. They are not on point here."); B. & H. Passmore M. & R. Co. v New Amsterdam Cas. Co., 147 F2d 536, 538 (10thCir 1945)(while insurance contracts are construed according to the intent and mutual agreement of the parties, workersâ compensation statutes are construed with the beneficent legislative purpose in mind). Legal precepts surrounding respondeat superior also help to conceptualize activities encompassed within "scope of employment," meaning "in the context of the particular enterprise an employeeâs conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employerâs business." Leafgreen v. American Family Mut. Ins. Co., 393 NW2d 275, 280 (SD 1986) (quoting Rodgers v. Kemper Const. Co., 124 CalRptr 143, 148-49 (CalCtApp 1975)); Deuchar v. Foland Ranch, Inc., 410 NW2d 177, 180 (SD 1987); Alberts v. Mut. Serv. Cas. Ins. Co., 80 SD 303, 306-07, 123 NW2d 96, 98 (1963).
 [Â¶9] Most critical to deciding coverage here is the question whether Winger was acting within the scope of employment at the time the accident occurred. An act "is within the scope of a servantâs employment where it is reasonably necessary or appropriate to accomplish the purpose of his employment, and intended for that purpose, although in excess of the powers actually conferred on the servant by the master." Alberts, 80 SD at 307, 123 NW2d at 98. Considerations of time, place, and circumstance assist our evaluation. Krier v. Dickâs Linoleum Shop, 78 SD 116, 119, 98 NW2d 486, 487 (1959). Employees perform within the scope of employment even when they act with only implied authority. Howell v. Cardinal Industries, Inc., 497 NW2d 709, 711-12 (SD 1993). Such authority exists if an act is implicitly directed by an employer, or is of the same general nature of what is empowered, or is incident to conduct authorized. Deuchar, 410 NW2d at 180. If employers decline to specify the manner in which their employees must perform, employees may use "usual or suitable means" to accomplish their tasks. Wollman v. Gross, 484 FSupp 598, 602 (DSD 1980)(citing Alberts, 80 SD at 308, 123 NW2d at 99), affâd 637 F2d 544 (8thCir 1980).
 [Â¶10] Employees do not act within the scope of their jobs when they substantially deviate from the course of employment. See Phillips v. John Morrell & Co., 484 NW2d 527, 530 (SD 1992). If employees engage in conduct reasonably foreseeable in work performance, then no deviation transpires. Piper v. Neighborhood Youth Corps, 90 SD 443, 446, 241 NW2d 868, 869 (1976). See Buchino v. Industrial Comân of Illinois, 526 NE2d 425, 427 (IllAppCt 1988)(denying coverage because the employerâs act was not reasonable or foreseeable to the employer). Substantial deviations occur when employees abandon the work purpose in furtherance of a personal motive or "frolic." Piper, 90 SD at 446, 241 NW2d at 869. Whether a deviation is substantial depends upon its extent and seriousness. Phillips, 484 NW2d at 530.
 [Â¶11] With slight deviations, coverage resumes only when employees return to the course of employment. Ogren v. Bitterroot Motors, Inc., 723 P2d 944, 948 (Mont 1986). See also Buchino, 526 NE2d at 428. Conversely,

In the case of a major deviation from the business purpose, most courts will bar compensation recovery on the theory that the deviation is so substantial that the employee must be deemed to have abandoned any business purpose and consequently cannot recover for the injuries received, even though he has ceased the deviation and is returning to the business route or purpose.
Calloway v. State Workmenâs Compensation, 268 SE2d 132, 135 (WVa 1980)(collecting cases). If the deviation is "foreign" to the employerâs work, it will be deemed substantial. Sheerin v. Holin Co., 380 NW2d 415, 417 (Iowa 1986). Whether a deviation is so substantial to bar reentry into the course of business is a question of law. Phillips, 484 NW2d at 530-31 (question whether there was substantial deviation reviewed de novo); Calloway, 268 SE2d at 136; Pyne v. Witmer, 543 NE2d 1304, 1309 (Ill 1989)(deciding if a deviation is "exceedingly marked and unusual" enough to fall outside the scope of employment is a matter of law); Bush v. Parmenter, Forsythe, Rude & Dethmers, 320 NW2d 858, 866 (Mich 1982)(as a matter of law an employeeâs deviation was so substantial as to terminate the business purpose of the trip). But see Deuchar, 410 NW2d at 181 ("[Q]uestion of whether the act of a servant was within the scope of employment must, in most cases, be a question of fact ...").
 [Â¶12] As a matter of law, the trial judge found Winger was within the scope of his employment as his deviations were insubstantial and foreseeable. Accepting Wingerâs statement he left home around 6:00 p.m. to check the job site, it took him three hours and forty-five minutes to complete the task. By his own reckoning, had he driven the thirty-six miles round-trip to the job site near Nemo, it would have taken about an hour. Can roving through Canyon Lake Park, viewing a sunset on Skyline Drive, drinking and socializing in Rapid City bars, all surrounding an hour trip to a job site, constitute a minimal deviation? Winger insists he was acting for the County at all times:

Counsel: [B]ut do you claim you were working for the county when you were sitting there watching the sunset on Skyline Drive?
Winger: Thatâs hard to answer. My mind was working on county stuff.
Counsel: Do you claim you were working for the county when you were in the Buck âN Gator Bar having a beer?
Winger: I was working for the best interests of Pennington County.
 [Â¶13] Dier and Winger testified it was the practice of Highway Department workers to visit job sites after hours and on holidays, often without overtime pay or mileage reimbursement. [fn6]  Dier lauded the dedication and pride of the workers laboring for the County. This we do not dispute. Nor can we disagree with the factual finding that Winger had authority to look for Rolof after hours to assign him the duty of checking the Nemo site. Rolof testified his phone number was readily available through the Department and never before had Winger sought him in bars. Given this information, it appears senseless for Winger to have searched for Rolof at the Blue Lantern, the Time Out Lounge, and the Buck âN Gator. Nonetheless, deferring to the trial judgeâs finding it was necessary for Winger to seek out Rolof at these establishments, not seeing his motorcycle outside each bar would have been adequate. This sufficed at the Time Out Lounge, where Winger drove by and knew Rolof was not there because his vehicle was not present. Yet, Winger stopped at the other establishments, drinking and hobnobbing, talking to people at length. Most importantly, Dier confirmed Wingerâs drinking was not an act in the interest of or on behalf of Pennington County.
 [Â¶14] This is not a situation, as Winger argues, similar to the one treated in Krier. There, an employee of Dickâs Linoleum Shop in Pierre was sent to Chamberlain to complete a job. 78 SD at 118, 98 NW2d at 487. After his workday in Chamberlain, the employee drove two and one-half miles from town to eat dinner. On his return trip, he was injured in an accident. No deviation occurred, as "outside employees," or those who travel for a living, are treated differently. "The âcourse of the employmentâ of an outside employee is necessarily broader than that of an ordinary employee. His work creates the necessity of staying at hotels, eating at various places, and of travel in going to and returning from these places." Id. at 119, 98 NW2d at 488. Winger, who was based in Rapid City, was not an outside employee forced to travel a meandering route from his home to the Nemo site and back. He had access to phones from which he could have called Rolof. If his choice to search for him in bars was legitimate, how did drinking beer aid his quest? Cf. Therkildsen v. Fisher Beverage, 1996 SD 39, 545 NW2d 834. Even assuming Krier applies, "[t]he controlling factor is whether claimant was engaged in doing something which he might be reasonably expected to do while in the performance of his duties." 78 SD at 120, 98 NW2d at 488. A personal divergence to watch a sunset, take a pleasure drive, and drink beer is not something an employer would fairly expect. Those independent, self-serving endeavors unrelated to his job constituted a substantial deviation. See Jeffrey Scott E. v. Central Baptist Church, 243 CalRptr 128, 130 (CalCtApp 1988)(discussing acts unrelated to the job as preventing liability coverage); Crowe v. DeSoto Consolidated School District, 68 NW2d 63, 66 (Iowa 1955)(deviation was so "foreign" to the employerâs work it prevented recovery); Dupre v. La. Retailers Assân Self-Insurers, 509 So2d 608, 612-13 (LaCtApp 1987)(not "common sense" for an employee to remain in his scope of employment when he stopped at bars, notwithstanding the employeeâs assertion he was "promoting his business"). The trial court erred as a matter of law when it concluded Wingerâs deviations were not substantial enough to defeat coverage, and we reverse on that basis.
 [Â¶15] Winger would have us uphold coverage under the "dual purpose" doctrine. We recognized this concept in Johnson v. Skelly Oil Co., 288 NW2d 493 (SD 1980). As explained in Professor Larsonâs workersâ compensation treatise:

[When] a trip serves both business and personal purposes, it is a personal trip if the trip would have been made in spite of the failure or absence of the business purpose and would have been dropped in the event of failure of the private purpose, though the business errand remained undone; it is a business trip if a trip of this kind would have been made in spite of the failure or absence of the private purpose, because the service to be performed for the employer would have caused the journey to be made by someone even if it had not coincided with the employeeâs personal journey.
Id. at 495 (quoting 1 Larson Workmenâs Compensation Â§18.12 at 4-218 (1978)) (emphasis added). Accord South Dakota Med. Service v. Minn. Mut. Fire & Cas. Co., 303 NW2d 358 (SD 1981).
 [Â¶16] Winger left home after an argument with his wife. Earlier in the day, they had discussed taking a motorcycle drive together. His wife testified he went to Skyline Drive to clear his head, as he often did, and that he planned to drive through Canyon Lake Park, a place they frequented when pleasure riding. Winger testified similarly, saying Skyline Drive was a place he went to relax. The trial courtâs findings reflect: "Winger left his home on his personal motorcycle to go on a pleasure ride before completing his job task" and "Winger went up on Skyline Drive ... in order to watch the sunset."
 [Â¶17] These acts fail to solidify into a dual purpose episode. By the rule set forth in Deuchar and Leafgreen, actions carried out in a dual purpose must be foreseeable in the sense employee conduct must "not be so unusual or startling that it would be unfair to include the loss caused by the injury among the costs of the employerâs business." Frequenting bars and drinking, spending over an hour watching a sunset, and pleasure touring through a picturesque area are not acts foreseeable to an employer. Employers most certainly will consider it both unusual and startling that employees who spend long periods of self-enjoyment would do so in the assumption the risk-sharing pool covers everything simply because a brief work activity punctuates their indulgences. See Finsland v. Phillips Petroleum Co., 204 NW2d 1, 5 (Wis 1973) (to recover in a dual purpose situation, the employee must not do anything inconsistent with the prosecution of the employerâs business). As one court stated, after the work had been completed, "the plaintiff was under no duty to go in any particular direction or to discharge any duty but was in fact free to pursue his pleasure when he was involved in the accident." Smith v. A.I.U. Ins. Co., 457 So2d 868, 870 (LaCtApp 1984).
 [Â¶18] Further, the dual purpose doctrine cannot be used to create coverage when somewhere, sometime during a personal jaunt an employee may incidentally perform an employerâs work. In Johnson, for instance, we found a dual purpose when a worker dropped mail off for her employer in the morning on her way to work. It was foreseeable she would have done so. While on her way to work, she simply stopped at the post office to mail her employerâs letters. Winger, on the other hand, includes all he did that night within the service of his employer, when both common sense and his own testimony point to the contrary. We cannot accept the notion advanced at trial that his journey was for a dual purpose because a "trip of this kind would have been made in spite of the failure or absence of the private purpose ... ." Johnson, 288 NW2d at 495 (citation omitted). His objectives that night were too diffused, unlike the acts undertaken in Johnson. Foreseeability remains a necessary ingredient to determine whether an employee was in the scope of employment in the first instance. See Deuchar, 410 NW2d at 181; Leafgreen, 393 NW2d at 280-81. Most persuasive on this issue is the Michigan Supreme Courtâs observation that an employeeâs recovery is precluded when a "personal detour is so great that the deviation dwarfs the business portion of the trip." Thomas v. Certified Refrigeration, Inc., 221 NW2d 378, 384 (Mich 1974). Wingerâs journey took three hours and forty-five minutes. If this venture had a dual purpose, the business aspect was incidental, at best.
 [Â¶19] Winger also thrusts before us the exception to the "going and coming" rule to establish his claim. Generally, employees injured while going to and coming from work are not covered. Howell, 497 NW2d at 711; Driessen v. Schiefelbein, 67 SD 645, 649, 297 NW 685, 687 (1941). There are exceptions to this rule, see 82 AmJur2d Workerâs Compensation Â§297 (1992), and we have discussed some of them in our previous holdings. In Pickrel v. Martin Beach, Inc., 80 SD 376, 124 NW2d 182 (1963), we noted compensation is recoverable "to an outside employee who is injured while being transported to or from work in a mode or means of transportation furnished by the employer as an integral part of the contract of employment." 80 SD at 378, 124 NW2d at 183. This allowed recovery for an "outside employee," a lines installer, who was driving his employerâs pickup truck between Huron and Kimball while working on a job. That exception is inapplicable hereâbeyond the fact it was based on a workerâs compensation notion, it also applied to an outside employee.
 [Â¶20] Winger asserts another exception to the "going and coming" rule from Howell. There, an employee who slipped and injured herself in her employerâs icy parking lot was doing something "naturally and incidentally related to her employment" and therefore was entitled to workersâ compensation coverage. 497 NW2d at 712. Winger argues this exception applies because his operation of his motorcycle was incidental or actually involved in the performance of work duties, citing 82 AmJur2d Workerâs Compensation Â§ 304 (1992). Yet in a footnote in Howell, we specifically commented that the ruling "falls within the scope of our previous decisions for injuries occurring at the work place. It does not, and we do not, change the general rule which does not allow an employee to recover for injuries received going to or from the place of employment." Howell, 497 NW2d at 712 n7. Therefore, the case rested on the notion of what was "naturally and incidentally related" to the employeeâs employment, not an exception to the "going and coming" rule. No such relationship exists between Wingerâs fifteen-minute stop at the Nemo site and his recreational activities.
 [Â¶21] In summary, Wingerâs visit to the job site was a diversion from an evening of entertainment. We need not reach the issue of the trial courtâs findings on Wingerâs alcohol consumption, as we conclude he was not acting in the scope of employment at the time of the accident.
 [Â¶22] Reversed and remanded with instructions to enter judgment for SDPAA.
 [Â¶23] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.
Footnotes:
fn1 . Winger said he attempted to find Rolof at the bars because Rolof had recently moved. Rolof, however, testified Winger never had to locate him at a bar before and that his current phone number was readily available at the Highway Department for just the type of situation the Nemo site duty presented.
fn2 . Contrary to Wingerâs testimony, a employee of the Buck âN Gator testified Winger remained inside the bar or at least 45 minutes to an hour.
fn3 . The nurse testified by deposition.
fn4 . Wingerâs wife, Michaelea, is also a party to this action.
fn5 . Technically, the PEPL fund is not insurance, but a liability, self-insurance pool. SDCL 3-22-18; Kyllo v. Panzer, 535 NW2d 896, 900 (SD 1995); see generally In re Request for Opinion of Supreme Court, 379 NW2d 822 (SD 1985). However, coverage concepts are similar to insurance, so we apply the same general principles.
fn6 . Winger was given credit for two hours overtime for the night of the accident, but did not apply for mileage reimbursement.